TUTTLE *v.* EMBURY-MARTIN LUMBER CO.

1. MASTER AND SERVANT—INDEPENDENT CONTRACTOR—CONTROL OF SERVANT—RIGHT TO INTERFERE.

The test as to whether the relation is that of master and servant or independent contractor is the right to control the servant; it is not the fact of actual interference with the control, but the right to interfere, that distinguishes an independent contractor from a servant or agent.

2. SAME—LIABILITY OF EMPLOYER.

So, where claimant's husband was accidentally killed while hauling logs for a lumber company under an oral contract to haul with his own team, using a pair of sleighs owned by the company, at $2 a thousand, but subject to the same general conditions and control as the other employees of the company who were paid by the month, he was an employee within the provisions of Act No. 10, Extra Session 1912, so as to render the company liable to claimant.

3. CUSTOMS AND USAGES—CONTRACTS — NOTICE — EVIDENCE — PRESUMPTIONS.

The admissibility of evidence as to a custom or usage is based upon the fact that both parties to a contract were cognizant of it, and are presumed to have made their engagement with reference to it.

4. SAME—MASTER AND SERVANT—INDEPENDENT CONTRACTOR—EVIDENCE.

So, where there was no evidence that claimant's husband had any knowledge of any custom or usage to treat those who hauled by the thousand differently from those who worked by the month in the manner or nature of the control exercised over them by the employer at the time he engaged with defendant, or that he contracted with reference thereto, evidence as to any such custom was inadmissible for the purpose of establishing the relation of independent contractor rather than that of employee.

192 Mich.—25.

Certiorari to the Industrial Accident Board. Submitted June 7, 1916. (Docket No. 15.) Decided July 21, 1916.

Sarah Tuttle presented her claim for compensation against the Embury-Martin Lumber Company and the Lumbermen's Mutual Casualty Company for the death of her husband in defendant lumber company's employ. From an order awarding compensation, respondents bring certiorari. Affirmed.

*Adams, Crews, Bobb & Wescott* (*Jewell & Smith,* of counsel), for appellants.

*James F. Shepherd,* for appellee.

STONE, C. J. The question involved in this case is whether Ephraim Tuttle, the deceased husband of Sarah Tuttle, the applicant, was an independent contractor or an employee within the provisions of the workmen's compensation act. The Industrial Accident Board found that his relation was that of employee, and from that finding the respondents have brought the case here by certiorari.

Ephraim Tuttle, for whose death applicant claims compensation, was engaged in hauling logs for the Embury-Martin Lumber Company, near Cheboygan, on January 8, 1915, and met his death by being thrown from a load of logs while he was driving the team drawing the load between the skidway, where the logs were loaded, and the mill, where they were to be delivered. Tuttle was working for the company under the following agreement, as testified to on direct examination by E. L. Slade, woods superintendent of the company:

"Mr. Tuttle came to the office in the afternoon—I can't tell you the date, it was in the neighborhood of 10 days or two weeks before this accident occurred—

and wanted to haul logs, and he wanted to know how we were hiring and I told him. I told him we had all the teams by the month that we could use, on account of our barn room; our barn was full and was hired ahead. He said he could stay at home and haul by the thousand, and I hired him to haul by the thousand, at $2 a thousand, and we were to furnish the sleighs, and there was a certain pair of sleighs that the company had that he had hauled on the winter before, that had a short tongue, that he wished to use, and he came to town and brought those sleighs back with him. He used those sleighs one day, on the Monday before. * * * Later in the week Mr. Tuttle called me up by phone. He fixed our telephone line—the wind blew it down, blew a tree across it or something. Anyway, he fixed the line up voluntarily; he done it on his own accord, but he received his pay for it from the office; I guess he got some tobacco and things that the clerk gave him for his services. I guess he was coming over to the office on purpose to see about hauling.

"Q. What was the conversation over the telephone?

"A. He wanted to know if he could start hauling again, and I told him yes, to start on in the morning.

"Q. When was that?

"A. That was the evening of the 7th.

"Q. Was that all that was said over the phone?

"A. That is all I remember being said. It was a very short conversation.

"Q. Now, when hauling was done for you by the thousand feet, was it done on any particular days?

"A. No, it was any day they are a mind to come after a load.

"Q. Or with any regularity at all?

"A. No, they were loaded in turn as they came.

"Q. Were there any specifications made on a man's haul on any particular day?

"A. No, sir.

"Q. Did you determine—did the Embury-Martin Lumber Company or anybody in its behalf determine the size of his loads?

"A. No, sir.

"Q. Who did?

"A. He did, himself.

"Q. Does the Embury-Martin Lumber Company de-

termine the size of the loads hauled by your employees?

"*A.* It is simply up to the foreman and condition of his roads.

"*Q.* Do you give—does the Embury-Martin Lumber Company or any of its employees give persons who are hauling by the thousand feet any directions as to how they shall haul—as to the manner of their hauling —as to how rapidly they shall haul, or anything at all?

"*A.* One trip a day. We haul from that job one trip a day.

"*Q.* You mean that is all you can haul?

"*A.* That is all you can haul—one trip a day.

"*Q.* But you don't have any requirements by which they haul one trip a day?

"*A.* No, sir.

"*Q.* Or any particular number of trips?

"*A.* No, sir.

"*Q.* You simply tell them to haul from the skidway?

"*A.* To the mill.

"*Q.* To the mill?

"*A.* Yes, sir.

"*Q.* These people who haul by the thousand feet handle the logs at that end to where they are hauling, did they?

"*A.* Yes, sir.

"*Q.* They come and go where they please, and haul such loads as they please?

"*A.* Yes, sir.

"*Q.* When are they paid?

"*A.* They are paid whenever they call for their money at the office.

"*Q.* At any time?

"*A.* The load is scaled there, and they are given a slip or scale sheet and they can get their money then or let it stand for a week. They can have it any night after it is scaled.

"*Q.* That is the practice, is it?

"*A.* That is the practice."

Upon cross-examination, the following testimony was given by this witness:

"*Q.* Did you employ Mr. Tuttle to haul any particular number of thousand feet?

"*A.* No, sir.

"*Q.* Did you hire him to haul any designated lot of logs, I mean, outside of the general mass that you had out there?

"*A.* No, sir.

"*Q.* He didn't agree that he would haul 100,000 or 50,000, or any particular quantity?

"*A.* No, sir; we didn't let any jobs of any kind in that way.

"*Q.* Whose employees load the sleighs?

"*A.* Embury-Martin Lumber Company's.

"*Q.* What would he, Mr. Tuttle, be doing—I am taking him as one hauling by the thousand—what would he be doing as the logs were loading?

"*A.* We load the sleighs with a jammer, and they use the team on the cable at the jammer.

"*Mr. Kennedy:* Whose team do you use?

"*A.* The team we are loading; whosever team is on the sleigh.

"*Q.* Did you use Mr. Tuttle's when he was there?

"*A.* Yes, sir.

"*Mr. Shepherd:* So that Mr. Tuttle would be busy while the sleigh was loading, then?

"*A.* Yes, his team would be busy, and he would be busy, yes. The team they place on the sleighs—their own, yes.

"*Q.* He would be handling the team?

"*A.* Yes, sir.

"*Q.* Who fastens the chains around the logs and sees that they are secure on the load?

"*A.* The laborers.

"*Q.* Embury-Martin Lumber Company's employees?

"*A.* Yes, sir.

"*Q.* Mr. Liddy, for instance?

"*A.* Yes sir, there is three men in the gang.

"*Q.* How many men usually ride on a load down town—I mean in the course of business—I don't mean anybody that might catch on?

"*A.* One man, the driver.

"*Q.* Is there any difference in that regard as between men who are paid by the thousand and the men who work by the day?

"*A.* In regard to how many ride?

"*Q.* Yes.

"*A.* Why, no. That is his own option.

"*Q.* You said the man handled the haul himself after the load was on the sleighs?

"*A.* Yes, sir, after he left the skidway—after he got on his load, why, that was his load to go with—he handled that to the mill.

"*Q.* That was so of those who hauled by the thousand as well as those that worked by the day?

"*A.* Yes, sir.

"*Q.* So far as that was concerned, there wasn't any difference between the two classes of men?

"*A.* Not in regard to handling the load.    *    *    *

"*Q.* Let me ask this: Was this haul, on which he was found dead, on one of the Embury-Martin logging roads? Was that a road that was built by them?

"*A.* Yes.

"*Q.* For the purpose of hauling their logs from camp to the mill?

"*A.* Yes.

"*Q.* At Cheboygan?

"*A.* Yes, sir.

"*Q.* It was not a public highway?

"*A.* No, sir.

"*Q.* Was there any other place for men to haul logs from your camps, except the mill at Cheboygan?

"*A.* No, sir.

"*Q.* And you didn't haul logs from any other spot to the mill, except from those camps?

"*A.* No, sir."

The man who loaded the sleighs, and was called the "top loader," testified, among other things, as follows:

"*Q.* Did you put any logs on the sleighs of Mr. Tuttle?

"*A.* I did.

"*Q.* When was that?

"*A.* The 8th of January—the morning of the 8th.
*    *    *

"*Q.* Do you know how many logs—how many loads of logs he hauled that day?

"*A.* That was his first trip that he made to our gang.

"*Q.* Who directed him where to get the logs?

"*A.* I couldn't tell you. I presume the foreman did, though; it would be his place to.

"*Q.* Was the team brought up to the logs, or did you roll the logs to the team?

"*A.* Well, the sleighs were set there, and what didn't roll we dragged up.

"*Q.* The logs were in a certain place?

'*A.* They were on a skidway, yes, sir.

.'*Q.* Whose logs were they?

"*A.* Embury-Martin Company's.

"*Q.* Do you know who they were put on the skidway by?

"*A.* I do not, they were skidded before I went there.

\*     \*     \*

"*Q.* Mr. Tuttle told you when to stop loading, didn't he?

"*A.* Sure.

"*Q.* That is, he said when he had enough logs?

"*A.* Certainly.

"*Q.* There were some men working there by the month and others worked hauling by the thousand, were there not?

"*A.* Yes, sir.

"*Q.* There were about 21 or 22 teams there at that time hauling by the thousand, weren't there?

"*A.* I couldn't say for that.

"*Q.* There were quite a number?

"*A.* Quite a number of teams.

"*Q.* They wouldn't come necessarily, with any regularity, would they, that is, some might come one day and then not come for a day or so, and then come another day?

"*A.* Some that way, and some wouldn't.

"*Q.* That is, some would come off and on?

"*A.* Yes, some of them would.

"*Q.* And those that hauled by the thousand would determine for themselves how many logs they would haul, would they not?

"*A.* Yes, and also the whole of them tried—

"*Q.* Eh?

"*A.* The most of them.

"*Mr. Kennedy:* That is, you wouldn't load more on one team if—

"*A.* If they didn't want to take it, I wouldn't try it.

"*Q.* Well, it is true, isn't it, that if, some one who was hauling by the day came up with a sleigh, or some

one who was employed by the month or by the day, he wouldn't be allowed to go off with just a small load would he, with a few logs on?

"*A.* If I will be permitted, I would like to explain. I can explain it better than you can ask the questions.

"*Q.* All right, go on.

"*A.* The morning he came there, being the first trip —the foreman told me to put on a certain number of logs—I asked him whether he was hauling by the thousand or by the day, and he told me he didn't know until he saw Mr. Slade; so I put on logs until I got the sleigh loaded.

"*Mr. Kennedy:* They all got their loads at the same place?

"*A.* No, we had out other teams that morning, there was other teams to the other gangs.

"*Q.* The logs were all from the same land and from the same company?

"*A.* Yes, sir."

It further appeared that Mr. Tuttle did not live in the camp as did the other men, but lived at home. He fed and cared for his own horses. The load tipped over a short distance from the skidway, and deceased was crushed between two logs and died from his injuries on the same day. The Embury-Martin Lumber Company had three classes of men hauling logs from their camp to the mill at Cheboygan. The first class used company teams and the men were paid by the month; the second class used their own teams, were boarded at the camp and were also paid by the month; the third class used their own teams and company sleighs, and were paid by the number of thousand feet of logs they hauled to Cheboygan.

As already appears, the work of hauling logs, at the time and place where Tuttle was employed, consisted of loading the logs upon the sleighs, which was done by a loading crew at the skidway under the direction of the foreman or top loader. The logs were placed on the sleighs by an apparatus called a "jammer," which

consisted principally of a wire cable running through a block. A sleigh could only be loaded at a skidway where a jammer was set. The team on the sleigh to be loaded was hitched to one end of the cable and the other to the logs to be loaded. The team was then handled and driven by the driver, whether working by the month or by the thousand, under the direction of the foreman or top loader in charge of the loading crew. The logs were then fastened on the sleighs by the loading crews. The driver then drove to Cheboygan with the load of logs. No one accompanied the driver on the road to the mill. Where the injury occurred Mr. Tuttle was using a road built and maintained by the Embury-Martin Lumber Company. At the mill the driver placed the load of logs wherever directed by the company's foreman. The logs were unloaded by an unloading crew. The person hauling by the thousand did nothing with respect to unloading unless he so desired. Sometimes he assisted in unloading, but it was not required of him. The manner in which the work of transporting logs from the skidways at the camps to the mill was the same, whether the driver was paid by the month or by the thousand. Neither Mr. Tuttle, nor those who hauled by the thousand, agreed to haul any particular kind, quantity, or designated load of logs; they took logs from the same general mass which the others hauled from. The vice president of the company testified, among other things, that the foreman could prevent a man working by the thousand from taking a load if he so desired. Nothing was specifically said to Mr. Tuttle when he was employed about any custom among those who hauled by the thousand, nor was there any evidence that he knew of any custom.

The appellants contend that the conditions surrounding Tuttle's relation with the Embury-Martin Lumber Company contain eight elements which marked him as

an independent contractor, and not an employee; and that in cases of this character the courts of this State, and of England, and the industrial boards and courts in the United States, have determined that a man in Tuttle's relationship, as defined by these eight elements, is an independent contractor. The eight elements are as follows:

(1) Furnishing own equipment. Tuttle used his own equipment, horses, etc.

(2) Compensation by amount of work done. Tuttle received $2 per thousand for the logs he hauled.

(3) Control of working hours. Tuttle worked when he wished to and not otherwise. He could start work any time of the day.

(4) Control of the amount of work done. Tuttle could determine the size of the loads he hauled.

(5) Control of the manner of the work. Tuttle got his logs where he wished and was under no control while hauling.

(6) Freedom from supervision. Tuttle did not live in camp under the supervision of the foreman or other persons. He did not have to unload his logs as did the employees of the company.

(7) Control and care of equipment. Tuttle controlled and cared for his own team and equipment.

(8) Right to hire substitute or assistant. Tuttle could have sent a substitute or another man with another team if he had one.

It is urged by appellants that the distinction of the common law, between an employee and an independent contractor, exists under the workmen's compensation act, and it has been so held in other jurisdictions, citing Massachusetts, California, Illinois, and rulings of State boards; also *Curtis* v. *Plumtre* (Court of Appeals of England), 6 B. W. C. C. 87, and the following Michigan cases are also cited: *De Forrest* v. *Wright*, 2 Mich. 368; *Riedel* v. *Moran, Fitzsimons Co.*, 103 Mich. 262 (61 N. W. 509); *Wright* v. *Manufacturing Co.*, 124 Mich. 91 (82 N. W. 829, 50 L. R. A. 495); *Lenderink* v. *Village of Rockford*, 135 Mich. 531 (98

N. W. 4) ; *Burns* v. *Paint Co.,* 152 Mich. 613 (116 N. W. 182, 16 L. R. A. [N. S.] 816) ; *McBride* v. *Shingle Co.,* 173 Mich. 248 (138 N. W. 1077), and numerous cases in foreign jurisdictions.

The appellee calls attention to section 5, part 1, of the workmen's compensation law of this State (Act No. 10, Extra Session 1912, 2 Comp. Laws 1915, § 5423 *et seq.*), which provides that the following shall constitute employers subject to the provisions of the act:

"Every person, firm, and private corporation, including any public service corporation, who has any person in service under any contract of hire, express or implied, oral or written. * * *"

The appellee further contends that there is not only sufficient evidence in the record upon which the accident board could properly find claimant's husband was "in service under a contract of hire," but also that under the rules of law he was a servant as distinguished from an independent contractor; that the testimony of Mr. Slade, the woods superintendent, is to the effect that there was a contract of general employment. The following Michigan cases are cited by appellee: *Lewis* v. *Brick Co.,* 164 Mich. 489 (129 N. W. 726) ; *Ripley* v. *Priest,* 169 Mich. 383 (135 N. W. 258). And the following authorities are cited from other jurisdictions: *Kniceley* v. *Railroad Co.,* 64 W. Va. 278 (61 S. E. 811, 17 L. R. A. [N. S.] 370, and note) ; *State, ex rel. Virginia & Rainy Lake Co.,* v. *District Court,* 128 Minn. 43 (150 N. W. 211). The opinion in the last-cited case is quoted from at length.

Appellee's counsel urges that the eight elements set up by the appellants are not supported by the record, or are not controlling. We quote from appellee's brief:

"(1) Furnished own equipment. Tuttle used his own team and company sleighs. Under *Lewis* v. *Brick*

*Co., supra,* and *State, ex rel. Virginia & Rainy Lake Co.,* v. *District Court, supra,* this factor is immaterial Furnishing his own team was analogous to the laborer who used his own lights and explosives in the *Lewis Case,* and the woodsman using his own tools in the *Minnesota Case.*

"(2) He was compensated by the amount of work done. Piecework does not constitute the laborer who does it an independent contractor. *Lewis* v. *Brick Co.,* and *State, ex rel. Virginia & Rainy Lake Co.,* v. *District Court, supra; Kniceley* v. *Railroad Co., supra; Ripley* v. *Priest, supra.*

"(3) Control of own working hours. This is not true. He could only work when and where the jammers were set. He could only haul one load a day, and that is all any one could haul from the camps to the mill in Cheboygan. He could only get a load when the loading crew gave it to him, and they could refuse him a load if the company wished.

"(4) Control of the amount of work done. See *Lewis* v. *Brick Co.,* and the other cases cited. Like any other laborer he could quit. The employer could also discharge him. In the *Lewis Case* the court held the plaintiff to be a servant notwithstanding 'They (the laborers) furnished lights and explosives, or the cost of them, and were generally masters of their time 'and the efforts they should make.'

"(5) Control of the manner of work. The statement in appellants' brief, 'Tuttle got his logs where he wished and was under no control while hauling,' is not borne out by the record as to getting the logs where he wished. He could only get logs at the skidways where the jammers were set. He did not control the manner of work done. Embury-Martin Lumber Company's woods superintendent testified:

" '*Q.* And where they loaded was under your direction was it?

" '*A.* Yes, sir; they couldn't load any other place only where we had our jammers set to load.'

"As to control while hauling, no one controlled any of the drivers either by the month, day, or thousand, except when loading or unloading. There is no difference in this respect between admitted employees of the lumber company, paid by the month, and Mr. Tuttle.

" '*Q.* You said the man handled the load himself after the load was on the sleighs?

" '*A.* Yes, sir; after he left the skidway—after he got on his load, why, that was his load to go with—he handled that to the mill.

" '*Q.* That was so of those who hauled by the thousand as well as those that worked by the day?

" '*A.* Yes, sir.

" '*Q.* So far as that was concerned, there wasn't any difference between the two classes of men?

" '*A.* Not in regard to handling the load.'

"(6) Freedom from supervision. This is not true. At the only points where drivers came in contact with any necessity of supervision, they were controlled and directed. They could only get loads where the jammers were set; they loaded the sleighs with their own teams under the direction of the employer's foreman or top loader; the employer's servants fastened the load on the sleighs; he drove over roads built and maintained by the employer to its mills at Cheboygan, where he was directed where to place the load for unloading. None of the drivers, either by the thousand or day or month, unloaded or were required to assist in unloading. They could be controlled by the power of the employer to discharge. There is no testimony in the record to bear out the statement in appellants' brief, 'he did not have to unload his logs as did the employees of the company,' if by employees is meant drivers by the month. As far as living in the company's camps are concerned, living in camps or out of them does not bear on the question. The control of the means which the employer has over a servant does not go to the extent of controlling anything but the doing of the work which he has been engaged to do. One may be and is a servant of another without the control of the employer over his meals, lodging, and personal conduct outside of working hours. I have failed to find any case anywhere, or any semblance of authority for the statement, that there is any rule of law that control of anything except the work itself, in which the laborer is engaged, has any bearing whatever on the question. As far as doing the work was concerned, that is, hauling logs to Cheboygan from these camps, there was no

difference whatever between those who were paid by the day or month and Mr. Tuttle. Both were employed generally, although the rate of pay was different.

"(7) Tuttle owned the team he used and as owner had the right to manage it, subject to the directions of the employer while doing the employer's work. He drove the team in loading and went ahead and backed up as directed by his employer's foreman. Any pieceworker who uses his own tools naturally cares for them. Tuttle's tools were a team of horses.

"(8) Right to hire substitute or assistant. This statement that Mr. Tuttle could have sent a substitute or another man with another team is not borne out by the record in any manner whatsoever. The contract between himself and the employer hereinbefore stated was for Tuttle to haul logs. No one else was mentioned. He, himself, personally, with his team was hired to haul logs. * * * He asked for work and it was given to him. He had no more right to send a substitute or employ assistants at his employer's expense than a ditch digger has who sends a man in his place. If the employer accepts the substitute, of course he would have to pay him, but the contract gave Tuttle no such privilege. If it did, however, Tuttle was killed and not a substitute or assistant. The testimony in the record that some men had more than one team hauling, or brought a load in and were paid for it, is beside the point. In one instance they made arrangements before hauling, and in others they were volunteers whose labor was accepted and paid for."

In the recent case of *Gall* v. *Detroit Journal Co.*, 191 Mich. 405 (158 N. W. 36), we had occasion to examine this question, and many authorities in our own court and some from other jurisdictions are cited in the opinion of Mr. Justice Person. There is a vast amount of learning upon this subject. In the examination of this question, our attention has been called to more than 100 cases in other jurisdictions. The copious note to *Richmond* v. *Sitterding,* 65 L. R. A. 445 (101 Va. 354), and the notes to *Messmer* v. *Bell & Coggeshall Co.*, 133 Ky. 19 (19 Am. & Eng. Ann. Cas. 1), and *Cockran* v.

*Rice,* 26 S. D. 393 (128 N. W. 583), reported in Am. & Eng. Ann. Cas. 1913B, at page 570, will furnish an abundance of authority upon the subject.

In some cases much stress is laid upon the fact that the work to be performed is of an indefinite amount subject to discharge and control in that regard. Others, whether the employment is of a general, independent character, like that of draymen and common carriers, becomes the controlling question. We are of the opinion that the test of the relationship is the right to control. It is not the fact of actual interference with the control, but the right to interfere, that makes the difference between an independent contractor and a servant or agent. 26 Cyc. p. 1547.

In our opinion there was such control over the work of Tuttle, by the company, as makes it inconsistent to say that Tuttle was an independent contractor. His work was limited by the right of the company to terminate it at any time, and it was for no definite period or amount. The loading and unloading were under control of the company, both as to time and place. True, he was in charge of his team while going from the skidway to the mill, but that was true of all the drivers, whether working by the month or the thousand.

The most that can be said for the respondents is that, upon the evidence in the record, it might be for a jury to say, under proper instructions, whether the company participated and directed in the work of Tuttle to such a degree that the relation of master and servant existed, or whether he was an independent contractor. There was some evidence tending to show a custom. There was no evidence that Tuttle knew of any custom. Such evidence was admissible only on the ground that the parties were both cognizant of it, and must be presumed to have made their engagement

with reference to it. There was no such evidence. *Pennell* v. *Transportation Co.*, 94 Mich. 247 (53 N. W. 1049).

The real question in this case is: What was the relation which Mr. Tuttle sustained to the Embury-Martin Lumber Company? In our opinion he was a person in service under employment of that company, and comes within the provisions of the workmen's compensation law. Whether or not the relation of master and servant exists in a given case, under oral contract, is often a question of fact, or of mixed law and fact, and is to be proved like any other question.

In our opinion there was evidence in the case that warranted the Industrial Accident Board in reaching the conclusion which it did, and the proceedings of that board must be affirmed.

KUHN, OSTRANDER, BIRD, MOORE, STEERE, BROOKE, and PERSON, JJ., concurred.