CARLETON v. FOUNDRY & MACHINE PRODUCTS CO.

1. MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—"EMPLOYEES"—INDEPENDENT CONTRACTOR.

One is not an employee within the workmen's compensation act, but an independent contractor, where he is engaged in the business of moving heavy machinery and hires, pays and discharges workmen engaged in doing the work, is not required to give his personal services, has entire supervision of the work after the method of doing it has been determined, and receives compensation based upon the cost of material and labor and a specified per cent.[1]

2. EVIDENCE—JUDICIAL NOTICE.

Judicial notice will be taken of the custom of letting contracts on the basis of cost plus percentage as a contract price for a completed job.

[1]On construction and effect of workmen's compensation acts, generally, see comprehensive note in L. R. A. 1916A, 23. L. R. A. 1917A, 80.

Certiorari to Industrial Accident Board. Submitted October 19, 1917. (Docket No. 18.) Decided December 27, 1917.

Elizabeth J. Carleton presented her claim for compensation against the Foundry & Machine Products Company for the accidental death of her husband in defendants' employ. From an order awarding compensation, defendant and the Michigan Workmen's Compensation Mutual Insurance Company, insurer, bring certiorari. Reversed.

*Beaumont, Smith & Harris,* for appellant.

*Keena, Lightner, Oxtoby & Hanley,* for appellee.

FELLOWS, J. Counsel for plaintiff so clearly stated the issue in this case to the arbitrators that we quote it:

"The chief testimony as I understand it is as to whether Mr. Carleton was an employee or an independent contractor. He was doing this work on a time and percentage basis; that is, he hired the men. The usual procedure of doing the work was, when the Foundry & Machine Products Company wanted any work of this particular kind done, such as moving machinery or anything along that particular line, they would call Mr. Carleton up, and he would go over and they would go over the work to be done together, and map out some plan of doing it, and then after this was done Mr. Carleton brought men and put them to work, and they would do the work. When the work was all done he was paid on the basis of the amounts he had paid out to his helpers, plus 10 per cent. When he worked himself, as he did at times, his own time was put in at 50 to 55 cents an hour. This raises the question, of course, as to whether he was an independent contractor or an employee."

The work in hand consisted in lowering some heavy machinery from the third to the first floor of defendant's plant. Defendant's plant was not provided with

the necessary appliances to do such work, and whenever it had such work to do it let the job to decedent who was in that business. The method adopted was that if defendant had a job of this character to be done its plant manager would communicate with decedent who would come over to the plant and they would discuss the matter together, the manager informing decedent what the company wanted done, they going over the job under consideration; there were no plans or specifications prepared. The contract was not reduced to writing, but rested in parol; by its terms decedent was to furnish all tools and appliances, some of which he owned, and some of which he borrowed; he was to furnish all material, was to furnish all labor, either men in his regular employ, and at times he had as high as 20, or those employed by him for the special job. Carleton's men did not punch the time clock of defendant, and their hours differed from those of defendant's employees. They were paid by Carleton. Upon completion, or during its performance, if extended, he rendered a bill which included the cost of all material and labor, plus 10 per cent. There was no stated periods for rendering these bills during the progress of the work. They were rendered on regular statement forms, the heading of which was, "F. E. Carleton Construction Company, Teaming and Carpenters, 623 Fourth avenue, Telephone, Grand 2715." If he performed any labor himself, his time was charged in the account at regular wage per hour. He was not required, however, by the terms of his contract to personally do any work, and frequently had several of the jobs running at the same time for different companies. The company had the right to change the plans; this is said to be of mutual benefit, permitting the work to be done as the company desired it, and decedent getting the percentage for the additional work the change entailed. The decedent received his fatal injury on Decoration

Day at defendant's plant. On this day none of defendant's employees were at work, and decedent had informed defendant's manager that he could get his whole gang together on that day and could also borrow tackle from the Russell Wheel & Foundry Company. There was testimony that defendant's manager made suggestions with reference to the work, but there is no testimony that he did this as matter of right, or other than he would have done had the compensation for doing the job been fixed at a lump sum. The board evidently thought that defendant had the right to hire and discharge the employees selected by Carleton, as it states that at least on one occasion one of Carleton's employees was discharged or sent away. There is an absence of evidence to support such conclusion. On one occasion one of Carleton's men appeared at defendant's plant looking, as the manager expresses it, "all in." He inquired of the workman what the trouble was and was told that he had "been working all night over to the Detroit Foundry." Under these circumstances he was not required to work that day. This act of humanity is not evidence of the *right* to hire and discharge, and we emphasize the word "right" because, as we shall presently see, it is not what control was exercised, but what right of control existed.

Three recent cases decided by this court under this act (Act No. 10, Extra Session 1912, 2 Comp. Laws 1915, § 5423 *et seq.*), are relied upon by the parties as being decisive of this case. The appellant relies upon the case of *Perham* v. *Roofing Co.*, 193 Mich. 221 (159 N. W. 140), while appellee insists that the cases of *Tuttle* v. *Lumber Co.*, 192 Mich. 385 (158 N. W. 875), and *Opitz* v. *Hoertz*, 194 Mich. 626 (161 N. W. 866), are more directly in point.

In *Perham* v. *Roofing Co.*, *supra,* Perham agreed with defendant to lay the roof on the Webber residence, at $1.75 per square. He arranged with another

workman to work on the job with him, and they hired a helper. In the execution of the work he was injured. Mr. Justice OSTRANDER, speaking for the court, said:

"The facts import, not a contract to lay slate at a price per square, instead of by the day, but a contract to do a job of slate laying. * * * Perham was in the exercise of an independent and distinct employment, not under the immediate control, direction, or supervision of the American Roofing Company."

And it was held that he was not entitled to compensation.

In the case of *Tuttle* v. *Lumber Co., supra,* Tuttle hauled logs for the defendant at $2 per thousand, and was injured while in that work. Mr. Justice STONE, who wrote the opinion in that case, very clearly laid down the rule as to the right to control to which we have adverted, and pointed out that where the question of control was involved it was a question of right, not a question of actual interference. He said:

"We are of the opinion that the test of the relationship is the right to control. It is not the fact of actual interference with the control, but the right to interfere, that makes the difference between an independent contractor and a servant or agent."

So it is not a question of interference, or noninterference, not a question of whether there has been suggestions or even orders, as to the conduct of the work; but a question of the right to act, as distinguished from the act itself or the failure to act. There was evidence in that case showing such right to control. Tuttle could only perform his labor under the control of the company. It, through its other employees, loaded his sleigh with logs; this could only be done at a skidway where a jammer was set by the company. He was equally controlled in the unloading, and in that case a very pertinent fact in determining this question existed—he had not the right of substitution. The con-

tract was for his personal services; and herein lies one of the distinguishing features in the instant case. Here the contract did not require the personal services of Carleton. He might work or not as he saw fit. The defendant had no say on that subject, no right of control over him or his time, or his movements. He could go or come as he saw fit. He contracted to produce results through means and men chosen by him, and did not contract for his personal services.

The distinction in this regard between the *Tuttle Case* and this case is made apparent by the consideration of two cases under the British compensation acts. The case of *Paterson* v. *Lockhart,* 42 Scottish Law Reporter, 755, upon principle is somewhat like the *Tuttle Case* and an award was allowed upon the theory that Paterson, a quarryman, was a workman within the sense of the act. The *Paterson Case* was urged upon the court in *Chisholm* v. *Walker & Co.,* 2 B. W. C. C. 261, where the applicant owned a horse and engaged to drag logs of timber for respondent at 8s. a day. He was not required to give his personal services. Lord Justice Clerk said:

"On the facts stated here I cannot find anything to indicate that this man was a servant employed by a master and remunerated by wages, that is, at so much per day or per hour or per piece. The present case is a case in which a man who has a horse of his own goes to a firm of timber merchants; they say that they want logs removed from one place to another; he says, 'I have a horse, I shall bring it and work any day you wish me to do so, and for that you will pay 8s. a day.' There is nothing there of the nature of wages. It would have been the same thing if he had brought twenty horses to do the work instead of one. The contract was that he should get the work done. It was not a contract that he should do the work personally, but that he should do it in the only way in which it could be done by having somebody to lead the horse. That is not a contract of service. The case of Paterson was quite different. There the man claiming compen-

sation was bound to do the work himself at so much a day."

This was concurred in by Lord Low and Lord Ardwall and compensation was refused.

The case of *Vamplew* v. *Parkgate Iron & Steel Co.*, 5 W. C. C. 114, is somewhat in point here. Deceased in that case agreed to break steel and clear cinders at so much per ton. He employed several men to assist him. The county court judge found he was an independent contractor and this was affirmed, Collins, M. R., saying:

"But the cardinal factor which underlies the whole of this legislation is that the act deals with the relation of employer and employed. The very word 'employment' shows that that relationship must exist to bring a case within the act."

In the *Tuttle Case* the company had contracted for the time and the services of a particular person, and the contract could not be performed, as matter of right, except by the performance of such services by the particular person employed. The master has the right to select his servants; he may hire and discharge them. He is the master who has the choice, control, and direction of the servants, and control does not exist unless the hirer has the right to discharge them and employ others in their places. *Pioneer Fireproof Construction Co.* v. *Hansen*, 176 Ill. 100 (52 N. E. 17).

In the case of *Opitz* v. *Hoertz, supra,* the controversy arose between defendants as to who was liable for the compensation. The work was being done on the premises of Brown & Sehler Company. That company had contracted in writing with Hoertz & Son for supervision of the work. But

"this left the reserved power in Brown & Sehler Company to determine when the work should begin, how rapidly it should progress, and to stop the work at any stage if it chose to do so. It was left with

Brown & Sehler Company to determine what buildings should be erected, whether they should be large or small, how much they should cost, of what material they should be constructed, and, when once decided, to purchase the materials therefor. It was left to Brown & Sehler Company to employ the men and teams if it chose, and to agree with the men on a price to be paid for their labor and to pay them,"

and it was held that under these facts Hoertz & Son were not independent contractors. The power reserved in Brown & Sehler Company was the power of an employer, not the power of a contractee dealing with a contractor. The power there reserved, the right of control there present, is absent in the instant case, and that case is clearly distinguishable from this one in its material facts.

That the courts recognize the distinction between the right to control employees, and the means and methods to be observed in the conduct of the work, as distinguished from the making of suggestions with reference to the work, is evidenced by the case of *Curtis* v. *Plumptre*, 6 B. W. C. C. 87. Curtis was injured while cutting down trees, which he was doing under an arrangement which partook of the nature of an independent contract. The effect of the arrangement was sought to be obviated by proof that the farm bailiff had exercised control, having told the men which way to make the tree fall. Cozens-Hardy, M. R., in the course of his opinion, remarking:

"A man often does employ an independent contractor with a gang, and he comes down and sees the man doing something injurious, and he says, 'Don't do it this way. Do it some other way.' That is not control. It is a piece of advice by the landowner to a man employed by a subcontractor."

In the case of *Smith* v. *Simmons*, 103 Pa. 32 (49 Am. Rep. 113), plaintiff in error and defendant in the court below had contracted with one Florence to dig

a ditch. Mrs. Simmons recovered a judgment growing out of an injury occasioned by the negligence of Florence. The question presented was whether Florence was an independent contractor. The judgment was reversed, the court saying:

"Florence undertook the whole job for the compensation of $25, and the defendant had nothing to do except furnish the pipe and the box in which it was to be inclosed. With Florence, in the execution of this contract, he could no more interfere than he could about a job in which he had no interest. He might advise, but the contractor could receive or reject that advice as he saw fit; he might put a fence around the ditch whilst in process of construction, and Florence might treat it as an obstruction and remove it. In other words, Dr. Smith could not control the execution of the contract. He was entitled to a finished job, but it was not his business to see to, or regulate, the manner of its doing."

Nor is inspection, or such supervision as may be necessary to secure the ultimate result, sufficient to change the character of the contract, or the status of the parties. *Casement* v. *Brown*, 148 U. S. 615 (13 Sup. Ct. 672). In this case it was said by Mr. Justice Brewer, speaking for the court:

"Obviously, the defendants were independent contractors. The plans and specifications were prepared and settled by the railroad companies; the size, form and place of the piers were determined by them, and the defendants contracted to build piers of the prescribed form and size and at the places fixed. They selected their own servants and employees. Their contract was to produce a specified result. They were to furnish all the material and do all the work, and by the use of that material and the means of that work were to produce the completed structures. The will of the companies was represented only in the result of the work, and not in the means by which it was accomplished. This gave to the defendants the status of independent contractors, and that status was not affected by the fact that, instead of waiting until the

close of the work for acceptance by the engineers of the companies, the contract provided for their daily supervision and approval of both material and work. The contract was not to do such work as the engineers should direct, but to furnish suitable material and construct certain specified and described piers, subject to the daily approval of the companies' engineers. This constant right of supervision, and this continuing duty of satisfying the judgment of the engineers, do not alter the fact that it was a contract to do a particular work, and in accordance with plans and specifications already prepared. They did not agree to enter generally into the service of the companies, and do whatsoever their employers called upon them to do, but they contracted for only a specific work. The functions of the engineers were to see that they complied with this contract—'only this, and nothing more.' They were to see that the thing produced and the result obtained were such as the contract provided for."

In the case of *Foster* v. *City of Chicago,* 96 Ill. App. 4, it was sought to escape the question of independent contractor by insisting that the city had such a supervisory control, through the superintendence of the commissioner of public works, as to create the status of master and servant. This suggestion the court declined to follow, saying:

"The difference between an independent contractor and a mere servant is not determined solely by the retention of a certain kind or degree of supervision by the employer. It is to be determined by the contract as a whole, by its spirit and essence, and not by the phraseology of a single sentence or paragraph."

The opinion of the appellate court in this case was adopted by the court of last resort in *Foster* v. *City of Chicago,* 197 Ill. 264 (64 N. E. 322). Without further quotation from the authorities, we cite the following cases as dealing with this question: *Uppington* v. *City of New York,* 165 N. Y. 222 (59 N. E. 91, 53 L. R. A. 550) ; *Frassi* v. *McDonald,* 122 Cal. 400 (55 Pac. 139, 772) ; *Hughes* v. *Railway Co.,* 39 Ohio

St. 461; *Humpton* v. *Unterkircher & Sons,* 97 Iowa, 509 (66 N. W. 776) ; *Powell* v. *Construction Co.,* 88 Tenn. 692 (13 S. W. 691, 17 Am. St. Rep. 925) ; *Harding* v. *City of Boston,* 163 Mass. 14 (39 N. E. 411) ; *Rogers* v. *Railroad Co.,* 31 S. C. 378 (9 S. E. 1059) ; *Ridgeway* v. *Downing Co.,* 109 Ga. 591 (34 S. E. 1028) ; *St. Louis, etc., R. Co.* v. *Willis,* 38 Kan. 330 (16 Pac. 728) ; *Corbin* v. *American Mills,* 27 Conn. 274 (71 Am. Dec. 63) ; *Gall* v. *Detroit Journal Co.,* 191 Mich. 405 (158 N. W. 36), and authorities there cited.

We have cited but a fragmentary part of the cases. There is much of case law on the subject, and text-writers have given it no little attention. There is not the conflict found on many subjects. We have indicated the quite universal trend of decision. Each of the three cases from this court relied upon by counsel in the instant case are in accord with it.

Having in mind now the distinction between an independent contractor and an employee, let us again briefly refer to the undisputed facts.

Carleton was in the exercise of a distinct and independent employment. The contract between defendant and Carleton was for the doing of a job in the line of his (Carleton's) business; the job of lowering heavy machinery from the third to the first floor; the contract did not require the personal services of Carleton, it could be performed by substitutes chosen by him; it did not give to defendant the right to control either as to means or men in carrying it out, Carleton and Carleton alone hired, paid, and discharged the workmen. After deceased had been informed by defendant's manager what job defendant wanted done, and they had gone over it, its execution was turned over to deceased, and he furnished the tools and men, and was independent in methods and means. He, in following an independent business,

undertook to do a specific job of work in his own way, with his own men, and his own appliances, without submitting himself to control as to petty detail as would an employee; any suggestion that came from defendant was advisory only, without the absolute right of interference; any supervision had to do only with ultimate results.

Under the admitted facts, on the undisputed testimony, deceased was not an employee within the meaning of the act. We may take judicial notice that the arrangement of paying cost, plus a percentage as a contract price for a completed job, is growing in favor, and is becoming a common plan adopted by contractors in place of a lump sum payment. The Federal government has let contracts involving the expenditure of enormous sums of money on this plan. The change is only in the method of computing payment. There is no change in the relation of the parties from that which exists where the payment is a lump sum. The manner of computing payment for the completed job is not controlling; a change in this regard does not convert an independent contractor into an employee, either at common law or within the meaning of the act.

The award of the industrial accident board is reversed.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE, STEERE, and BROOKE, JJ., concurred.