VAN SIMAEYS *v.* GEORGE R. COOK CO.

1. MASTER AND SERVANT—INDEPENDENT CONTRACTOR—CONTROL OF SERVANT—RIGHT TO INTERFERE.

    The test of the relationship of master and servant is the right to control; it is not the fact of actual interference with the control, but the right to interference, that makes the difference between an independent contractor and a servant or agent.

2. SAME—WORKMEN'S COMPENSATION ACT—PERSONAL INJURIES—LIABILITY OF EMPLOYER.

    Where claimant was accidentally injured while hauling dirt for defendant, claimant using his own team and wagon and being paid by the load, but defendant retained actual supervision and control of the work, the relationship of master and servant existed, rendering defendant liable under the workmen's compensation act.

Certiorari to Industrial Accident Board. Submitted April 3, 1918. (Docket No. 26.) Decided June 3, 1918.

Albert Van Simaeys presented his claim for compensation against the George R. Cook Company for injuries sustained in defendant's employ. From an order awarding compensation, defendant and the Prudential Casualty Company, insurer, bring certiorari. Affirmed.

*Frederick J. Ward,* for appellants.

*Guy W. Moore* and *Hal P. Wilson,* for appellee.

STONE, J. This case is before us upon certiorari to the industrial accident board, which board allowed the claim of the applicant. The applicant had been working for the respondent George R. Cook Company, with his team of horses, doing general teaming work for about five months before his injury, and had been paid

See notes in L. R. A. 1916A, 23; L. R. A. 1917D, 80.

by the day.  A few days prior to his injury, however, a new arrangement was made between the applicant and said respondent whereby the applicant, together with a number of other employees, agreed to haul a quantity of dirt to make a certain fill, at the rate of 65 cents, then later 75 cents per load.  While so engaged applicant received injuries, which he claims arose out of and in the course of his employment, resulting in permanent disability.  The respondent, as an employer of labor, was operating under the workmen's compensation act, and was insured by the Prudential Casualty Company.  The applicant, if an employee, which is the sole question in the case, was also operating thereunder.  The respondents claim that the applicant was an independent contractor.  The applicant relies upon the case of *Tuttle* v. *Lumber Co.*, 192 Mich. 385, as justifying the finding of the board.

The contract was oral, and its terms were testified to by the applicant and another witness.  We will briefly refer to the testimony to ascertain whether or not an inference of control of manner of the work of applicant by the respondent George R. Cook Company may be gathered, which, as matter of fact, warranted the finding.  The injury occurred on October 17, 1916.  The applicant testified before the arbitration committee, in part, as follows:

"*Q*. Who were you working for?

"*A*. For Cook.  George R. Cook.

"*Q*. That is the respondent in this case—George R. Cook Company?

"*A*. Paying is done always by Jim Cook, by his brother.

"*Q*. Who hired you?

"*A*. The foreman.

"*Q*. Who is the foreman?

"*A*. John Reaum.

"*Q*. Who was he foreman for?

"*A*. For the company, Cook, for George and Jim Cook.  * * *  He has got 2,000 loads of dirt to fill

in there and we get 65 cents a load. That was on the start. Then I had that only seven days. Then raise the price to 75. * * *

"*Q.* Who told you where to get this dirt?

"*A.* The man on the street.

"*Q.* Who told you where to get that dirt—did anybody?

"*A.* There was Jim, the contractor; we got orders from him to do it; we could not do it our own way.

"*Chairman Reaves:* He asked you who told you to go and get that dirt.

"*Q.* Who told you? What is the name of the man that told you to go and get that dirt?

"*A.* Jim Cook.

"*Q.* Who is Jim Cook?

"*A.* That is brother from George Cook.

"*Q.* Who told you where to take this dirt?

"*A.* Jim Cook, of course I don't know—

"*Q.* Now, I don't want you to say anything—you are not supposed to do anything but answer my questions. We will find out what you don't know later on. Who loaded this dirt into your wagon?

"*A.* I am loading the dirt.

"*Q.* You loaded it in. Who unloaded it?

"*A.* I unload; of course.

"*Q.* What work were you doing before you started hauling this dirt?

"*A.* Scraping. * * *

"*Q.* Everybody had to haul the dirt away?

"*A.* Yes.

"*Q.* What time did you go to work in the morning?

"*A.* Seven o'clock.

"*Q.* Who told you to come to work there at 7 o'clock?

"*A.* That was our orders. That is orders when we start at seven o'clock, to quarter of five at night.

"*Q.* Who told you that was your hours?

"*A.* The foreman.

"*Q.* On the 17th of October, 1916, just tell them what happened, how you got hurt?

"*A.* Well, I was loading, and the dirt was kind of hard, and I was loading and I jumped on the wagon and turned the horses around and my front wheel must have fell in a hole, and my horses got scared and began to kick, and I was turned around to go on

that place where the dirt was loose, and the horses kick and start to run, and I fall between the pole and the two horses.

"*Q.* What happened to you?

"*A.* I got my leg broken right here (indicating).

* * *

"*Q.* On that job what did you furnish yourself besides yourself?

"*A.* He hires me and my team, that is all.

"*Q.* He hires you and the team?

"*A.* My team and the wagon, too.

"*Q.* That was your wagon, too?

"*A.* My wagon and my horses."

On cross-examination he testified:

"*Q.* You went there when you wanted to, didn't you?

"*A.* No.

"*Q.* Sometimes you had nine or ten loads a day?

"*A.* I usually had twelve loads a day.

"*Q.* Did you sometimes have nine or ten?

"*A.* I don't think I had.  * * *

"*Q.* When you had your wagon full all that was necessary for you to do was to drive away?

"*A.* No.  I got to see that the foreman see the load.

"*Q.* The foreman checked off your load?

"*A.* Yes.

"*Q.* They didn't care how many loads you took?

"*A.* Well, no; no, sir.

"*Q.* You could come on there at any time you wanted to, couldn't you?

"*A.* No, sir; had to start at 7, finish at 5.  * * *

"*Q.* When you got your wagon loaded you drew out and the foreman took a check on your load?

"*A.* Yes, sir.

"*Q.* When you got unloaded you could go home if you wanted to, couldn't you?

"*A.* No; at five o'clock.  Got to be there at 7 o'clock in the morning."

Re-direct examination:

"*Q.* Who told you when to begin those dirt hauling jobs, and when to quit?

"*A.* The foreman.

"*Q.* That is whose foreman?

"*A.* Mr. Reaum, John Reaum.

"*Q.* John Reaum?

"*A.* Yes. Same foreman."

Re-cross examination:

"*Q.* Every time you drew a load there you got a coupon?

"*A.* Yes.   *   *   *

"*Q.* At this time you were working according to loads?

"*A.* Yes, that is the last where I got the accident.

"*By Chairman Reaves: Q.* Who told you where to unload this dirt?

"*A.* The foreman.

"*Q.* Did the foreman tell you?

"*A.* Yes.

"*Q.* What did he say to you this particular day, you got hurt?

"*A.* The foreman gave us orders to draw the dirt there.

"*Q.* Did he tell you where to go and get the dirt?

"*A.* Right in the street. They make a new pavement. They make a new grading and the dirt was hauled from the grading.

"*Q.* The George R. Cook Company are paving contractors. Is that right?

"*A.* Yes.

"*Q.* You were simply taking the dirt off the street and unloading it some place else?

"*A.* Yes.

"*Q.* Did the foreman tell you where to unload this dirt?

"*A.* Yes, he has got two thousand loads.

"*Q.* What did he tell you to do? Where did he tell you to take it?

"*A.* To fill it up there, to that place there. I don't know the name of the street.

"*Q.* Did he go and show you?

"*A.* Yes."

Peter Reno, a fellow workman, testified:

"*Q.* There were eight or nine teams there hauling dirt?

"*A.* Yes.

"*Q.* Was Mr. Reaum there, or wasn't he?

"*A.* Yes, he was there.

"*Q.* What time did he get there in the morning?

"*A.* He was always there before the teams got there. He got there practically before seven o'clock.

"*Q.* How long did he stay there?

"*A.* Until quitting time, five o'clock.

"*Q.* Who directed you men hauling, where to haul from, where to haul to, and had charge of the work?

"*A.* There was a lot there they had dug out.

"*Q.* I don't think you understand the question. Who?

"*A.* I don't know the man's name. I was trying to tell you about where he is. He got directed from our boss, and the boss told us where to put the dirt.

"*Q.* Wait a minute. Your boss. That is what I am trying to get at.

"*A.* Yes.

"*Q.* Who was that boss?

"*A.* Mr. Reaum. * * *

"*Q.* Outside of telling you just where to get the dirt, and where to dump it, you used your own judgment?

"*A.* About getting it, yes.

"*Q.* Getting it and how you would get it. All that you were required to do, by him, was to get it at a certain place?

"*A.* Well, we couldn't go to work and dig no holes. Had to take it off the grade stakes.

"*Q.* You had to take it off the grade stakes. But he did not tell you that you had to drive this way, or that you had to drive that way?

"*A.* No.

"*Q.* You used your own judgment in everything except where to put the dirt?

"*A.* Exactly.

"*By Chairman Reaves: Q.* Did he have the right to hire and discharge you?

"*A.* The boss did, certainly.

"*Q.* I will ask the same question of this other man (applicant). This foreman of that job, had he the right to discharge you at any time?

"*Applicant:* Yes. He has got the right to discharge me if I don't do right."

This is a part only of Reno's testimony.

We have made these extended excerpts from the testimony, to demonstrate that the work was done under the immediate control and supervision of the respondent George R. Cook Company.

In the *Tuttle Case, supra,* we said:

"We are of the opinion that the test of the relationship is the right to control. It is not the fact of actual interference with the control, but the right to interference, that makes the difference between an independent contractor and a servant or agent."

The instant case is a stronger case for the applicant than was the *Tuttle Case,* for *here,* there was *actual* supervision and control on the part of said respondent. The hours of labor, the inspection of each load, to see that it was a full load, the directions where to get the dirt and where to deposit it, and the right to discharge the applicant, all show that there was immediate control, direction, and supervision, as to the detail of the work.

The instant case is clearly distinguished from *Gall* v. *Journal Co.,* 191 Mich. 405; *Perham* v. *Roofing Co.,* 193 Mich. 221; *Carleton* v. *Machine Products Co.,* 199 Mich. 148; *Holbrook* v. *Hotel Co.,* 200 Mich. 597, and like cases.

In our opinion the order of the industrial accident board was fully justified by the evidence, and the same is affirmed.

OSTRANDER, C. J., and BIRD, MOORE, STEERE, BROOKE, FELLOWS, and KUHN, JJ., concurred.