345 Mich. 167 (1956)
76 N.W.2d 46
R.H. McMANUS COMPANY
v.
EMPLOYMENT SECURITY COMMISSION.
Docket No. 30, Calendar No. 46,543.
Supreme Court of Michigan.
Decided April 2, 1956.
Murray & Murray (Henry C. Murray, of counsel), for plaintiff.
Thomas M. Kavanagh, Attorney General, Edmund E. Shepherd, Solicitor General, Arthur W. Brown, Assistant Attorney General, for defendant commission.
KELLY, J.
Plaintiff is engaged in the business of excavation for underground piping or tunneling, requiring the hauling of dirt from the excavations. Plaintiff does not maintain its own trucks, and contracts with others to haul away the dirt. The trucks so used are not owned by the plaintiff. The truck owners carry their own insurance and the owners' names are printed on the side of the trucks. The owners of the trucks and their drivers were not carried on plaintiff's payroll, and withholding, social *169 security, or any other form of taxes, were not deducted from the truckers' charges.
Plaintiff paid $4.15 an hour to the truck owners and the driver received from the owner approximately $2.15 of this amount.
The arrangement between plaintiff and the truckers was indefinite and there was testimony establishing same:
"Whenever they would need us, we would stay there. We would work 2 or 3 days in a row. Otherwise, we would go out and work 1 day, maybe a day and a half or 2 days. It was indefinite."
In regard to working hours, it was testified:
"As a rule, you generally consider an 8-hour day, or you start at 8 and then if you are needed for 8 hours, you stay there. If they happen to finish up the job by noon, you go home at noon and you get a half day."
The agreement between plaintiff and the truck owners gave to either party the right to terminate the working arrangement at any time and the number of loads would differ from day to day due to problems that would arise in excavating. The truckers had nothing to do with excavating and the plaintiff operated its own loading cranes. The truckers would convey the load and dump it at a place designated by the plaintiff.
The Michigan employment security commission determined that: (1) The arrangement between plaintiff and the truckers constituted employment requiring contributions under the Michigan employment security act;[*] (2) fifty per cent of the payment made to the truck owners could be deducted as rental allowance; and (3) truck owners registered as employers *170 under the act in their own right would be exempt from the ruling.
An appeal was taken by plaintiff and the circuit court of Wayne county reversed the commission's decision and determination.
CLS 1954, § 421.42 (Stat Ann 1953 Cum Supp § 17.545), provides:
"Subject to the other provisions of this section `employment' means service, including service in interstate commerce, performed for remuneration or under any contract of hire, written or oral, express or implied."
Appellant insists that the test to be applied is whether the drivers were paid for service or product and contends they were paid for service because they were hired for indefinite periods of time and were subject to supervision and control of plaintiff. Sustaining this contention appellant calls attention to the following cases involving the workmen's compensation law as to whether the injured party was an independent contractor or employee: Tuttle v. Embury-Martin Lumber Co., 192 Mich 385 (Ann Cas 1918 C, 664); Van Simaeys v. George R. Cook Co., 201 Mich 540; Conrad v. Cummer-Diggins Co., 224 Mich 414; Dennis v. Sinclair Lumber & Fuel Co., 242 Mich 89.
In Nordman v. Calhoun, 332 Mich 460, 465, this Court quoted with approval Acme Messenger Service Co. v. Unemployment Compensation Commission, 306 Mich 704, wherein we said (p 709):
"`Neither the common-law rules as to the relation of master and servant, nor the "independent contractor" rules as applied to the workmen's compensation law or the licensing of carriers of passengers or goods for hire, will be considered to provide the controlling test as to whether one is "in the employment of" another, under the unemployment compensation *171 act. The statutory provisions in the act must be held to supply the test.'"
That each case must be determined on its own facts was established in Dennis v. Sinclair Lumber & Fuel Co., supra, when this Court stated (p 91):
"The Michigan workmen's compensation statute applies to employer and employee in the sense of such relation at common law, and not at all to the relation of an independent contractor to a job or jobs. An abstract definition of what constitutes an independent contractor is useful in the test of whether the relation in a case is such or that of an employee, but is seldom decisive, for each case has its own facts and the facts call for applicable law."
In Nordman v. Calhoun, supra, this Court held that part time janitor work was a "service" that constituted employment. That case was commented upon in Michigan Bulb Co. v. Unemployment Compensation Commission, 337 Mich 292. In the latter case, because its business was seasonal, the company entered into a working arrangement with individuals who took lists of names to their homes and typed same onto advertising literature. Deciding that those who did the typing were not employees, we said (pp 295, 296):
"In Nordman v. Calhoun, 332 Mich 460, stressed by defendant and relied upon by the lower court, which involved a period after the 1943 amendment, we said (p 466):
"`In our opinion the statutory definition of "employment" as provided in section 42(1) of the act is clear and unambiguous. It means service performed for remuneration or under an oral or written contract for hire. The only issue in the case at bar is to determine whether Date Scofield was an employee or an independent contractor.'
"This indicates that there still may be an independent contractor relationship not subject to the *172 act. How it can exist without the element of service for remuneration or under an oral or written contract for hire is not elucidated. The gist of the opinion is that when service is performed for remuneration, there is employment subject to the act.
"Was service performed for remuneration in the instant case? We think not. Rather, a finished product was delivered to plaintiff for which it paid a price. This case is similar to and ruled by Bert Baker, Inc., v. Ryce, 301 Mich 84, in the following respects: (1) Plaintiff did not contract for personal services, but only for results; (2) the employer-employee relationship did not result from the mere fact that plaintiff furnished the materials on which the typists worked or checked the typewritten materials for errors and advised the typists concerning the same, or furnished to others for a consideration some of the completed, typewritten materials."
We quote with approval the following from 27 Am Jur, Independent Contractors, § 7, pp 488, 489:
"As a practical proposition, every contract for work to be done reserves to the employer a certain degree of control, at least to enable him to see that the contract is performed according to specifications. The employer may exercise a limited control over the work without rendering the employee a mere servant, for a relation of master and servant is not inferable from a reservation of powers which do not deprive the contractor of his right to do the work according to his own initiative, so long as he does it in accordance with the contract. The control of the work reserved in the employer which effects a master-servant relationship is control of the means and manner of performance of the work, as well as of the result; an independent contractor relationship exists where the person doing the work is subject to the will of the employer only as to the result, but not as to the means or manner of accomplishment."
*173 In Nordman v. Calhoun, supra, we commented upon the purpose of the act as follows (p 465):
"In the case at bar we are dealing with the administration of a public act designed to benefit a class and society as a whole by cushioning the effect of unemployment."
We agree with appellee's contention that: "The purpose of the tax is to protect the employee in case of a layoff. What utter chaos would exist if, in the case of unemployment, these truckers made application for unemployment compensation insurance from every customer for whom they had worked."
The United States supreme court made the following pertinent observation in United States v. Silk, 331 US 704, 714-719 (67 S Ct 1463, 91 L ed 1757):
"The taxpayer must be an `employer' and the man who receives wages an `employee.' * * * Contracts, however `skilfully devised,' Lucas v. Earl, 281 US 111, 115 (50 S Ct 241, 74 L ed 731), should not be permitted to shift tax liability as definitely fixed by the statutes. * * * The courts will find that degrees of control, opportunities for profit or loss, investment in facilities, permanency of relation and skill required in the claimed independent operation are important for decision. No one is controlling nor is the list complete. * * * The truckmen hire their own assistants, own their trucks, pay their own expenses, with minor exceptions, and depend upon their own initiative, judgment and energy for a large part of their success. * * * Where the arrangements leave the driver-owners so much responsibility for investment and management as here, they must be held to be independent contractors. These driver-owners are small businessmen. They own their own trucks. They hire their own helpers. In one instance they haul for a single business, in the other for any customer. The distinction, though important, is not controlling. It is the total situation, including the risk undertaken, the control exercised, *174 the opportunity for profit from sound management, that marks these driver-owners as independent contractors."
It is difficult to understand the commission's ruling excluding all truck owners who paid, on their own account, the unemployment tax to the commission. These exempted truck owners were subject to the same supervision and control by the plaintiff as were the truck owners not exempted by the commission. The statutory test must be determined by considering the relationship existing between the truck owners and the plaintiff and not the relationship existing between the truck owners and the commission.
Judgment affirmed. No costs, a public question being involved.
DETHMERS, C.J., and REID, BOYLES, and CARR, JJ., concurred with KELLY, J.
SMITH, J. (dissenting).
In my dissent in a previous trucking case I pointed out that control as a test for the employment relationship was "ambiguous, uncertain, and slippery." (Pazan v. Unemployment Compensation Commission, 343 Mich 587, 592.) I questioned the relevance of the tort test of control to the relief of the sufferings involved in mass unemployment. I expressed the opinion that the test formulated by the supreme court of the United States (that described, with considerable contraction, as one of "economic reality") should be employed. Apparently my Brethren were unpersuaded.
We now have another such case. Again we must determine whether the trucker involved is an employee or an independent contractor.
What test are we now using? In my Brother's opinion the control test described in 27 Am Jur, Independent Contractors, § 7, pp 488, 489 is quoted with *175 express approval. The "service-or-product" test applied in Michigan Bulb Company v. Unemployment Compensation Commission, 337 Mich 292, is quoted without adverse or critical comment. And the case from the United States supreme court which described that court's rejection of the test of control and its adoption of the test of economic realities resulting from the total situation is quoted at length. United States v. Silk, 331 US 704 (67 S Ct 1463, 91 L ed 1757). It is impossible for me to ascertain from the opinion of Mr. Justice KELLY what test the Court is now applying.
Is it the control test? Let us turn to the words of the employer himself for his view as to whether or not he controls these workmen. In his application for determination of employment status we find him making the following answers to questions propounded to him:
"Do you have the right to:
"(a) Determine the time of performance? Yes.
"(b) Prescribe the hours during which the individual will perform the service? Yes.
"(c) Direct, control or supervise the manner in which the services are to be performed? Yes. Explain. This is true in most anything we buy. In construction work, it is necessary to control and direct the various phases in order to get the work stages properly coordinated."
This was how all of the above worked in actual practice according to one of the truckers:
"They have an officer dispatcher, and they will tell you where to proceed and where to go, and when you arrive there, whatever time he designates, why, from there on the supervisor or the foreman or whoever is on the job takes over and he is the one, and both of us agree on the time and I get my ticket signed at the end of the day as to how much time I put in, ordinarily."
*176 The record well justifies the summary found in appellant's brief, pointing out that:
"The company, in the instant case, by means of a dispatcher, shifted the men wherever they were needed on construction jobs. The owner-drivers had no contract for a specified piece of work; they were not employed to deliver 1 load or 2 loads or any definite number of loads, but they worked by the hour and were merely engaged in hauling dirt, broken concrete, stone, sand or other materials as those materials were furnished for hauling. The company could stop loading at any time it desired and terminate their services in this respect. It controlled the amount of work the owner-drivers could do and, in fact, so far as control was necessary, it was exercised by the company."
From all of this, we must conclude, from my Brother's result, not that the employer was in complete control of "the various phases," and "the manner in which the services" are rendered, but just the opposite: that the employer lacked control over the employee. Just what additional control the employer would exercise over an admitted employee doing this same work is difficult to hypothesize. The employer argues that he had no "control" over the "methods" used by the truckers in doing their work. I have much difficulty with this argument. Not only is it inconsistent with answer (c) above, but I am plagued by this question (unanswered in the record): How many methods for hauling and dumping truck-loads of dirt are there? Is it meant, for instance, that the trucks may be unloaded with shovels, as contrasted with being upended and dumped? But if this (or something like this) is what is meant, what conceivable relationship to the purposes of the act does this factor have?
Ordinarily when a man is told by another what to do and where to go, and may be fired at will, he is *177 said to be under the control of that other. Apparently not so in this case. What we are here doing (if, in fact, we are employing the control test) is employing a language of our own ("control", "methods"), having a secret significance to some of us not shared by the rest of mankind. Our meanings should be made clear to our people. If all of the above is not control we should tell our people what control really means in order that they may know and govern their conduct accordingly. It must never be forgotten, in the administration of these great humanitarian acts, that we have more than verbal problems, more than an exercise in semantics. We have human beings whose needs are known to our people and whose vividly remembered sufferings during prolonged periods of mass unemployment are never to be repeated. The administration of such an act cannot be made to turn upon such utterly immaterial trivialities as to the "method" used in hauling dirt.
Are we using as a test the criterion employed in the Michigan Bulb Company Case, supra, that between a service and a product? If so, we eagerly embrace worse confusion. The distinction is spurious, the dichotomy false and misleading. It answers nothing, for products result from services. These are not inconsistent concepts for the purposes of this act. In the case before us, the commission argues that a service is involved, i.e., truck driving. The company responds, however, by pointing out that the trucks hired "held so much quantity of dirt, no more and no less," and that it was "contracting for so much of a quantum to be carried away on an hourly basis." It seems to point to a product. Which is right? Does the charwoman render a service (mopping) or sell us a product (a spotless floor)? Will it depend upon her "method" of mopping? The question always and ever remains, whether the service *178 was rendered (or its resulting product furnished) by an employee or by an independent businessman or woman. The service-product test merely restates the problem and solves nothing.
Turning to the Federal test (See United States v. Silk, supra, and cases cited), what relationship between the truckers and the company do we have as a matter of economic reality? That cannot be told from this record. The facts required for the application of such a test have not been developed to the degree necessary for its intelligent application. Accordingly, this judgment of the circuit court should be reversed and the cause remanded to such court with instruction to remand the matter to the employment security commission for further proceedings not inconsistent herewith.
No costs, a public question.
SHARPE, J., concurred with SMITH, J.
BLACK, J., took no part in the decision of this case.
NOTES
[*] CL 1948 and CLS 1954, § 421.1 et seq. (Stat Ann 1950 Rev and Stat Ann 1953 Cum Supp § 17.501 et seq.).