## UNITED STATES FIDELITY & GUARANTY CO. OF BALTIMORE, MD., v. LOWRY. (No. 6341.)

(Court of Civil Appeals of Texas. Austin. May 18, 1921. Rehearing Denied June 15, 1921.)

1. **Master and servant ⬤═367—Traveling salesman held "employé" within Compensation Act, and not an "independent contractor."**

A traveling salesman, performing the usual and customary services for his employer, who could rightfully discontinue work or be discharged at any time, and was actually controlled by his employer in the performance of his work, *held* entitled an employé within the Workmen's Compensation Act, pt. 4, § 1 (Vernon's Ann. Civ. St. Supp. 1918, art. 5246—82), and not an independent contractor although he was not upon the pay roll of the employer, and was not paid wages, receiving his compensation by way of commission.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Employé; Independent Contractor.]

2. **Master and servant ⬤═418(5)—Admission of compensation award in evidence held not reversible error.**

In a suit to set aside an award under the Workmen's Compensation Act (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—91), it was not reversible error to admit in evidence a certified copy of the award made by the Industrial Accident Board, where it did not appear that the court considered the award in rendering a judgment for any improper purpose, and it was apparent that upon all the facts, which were practically undisputed, the court could properly have rendered no other judgment.

Appeal from District Court, Brown County; J. O. Woodward, Judge.

Action by the United States Fidelity & Guaranty Company of Baltimore, Md., against Mrs. J. S. Lowry, to set aside an award of the Industrial Accident Board in a proceeding under the Workmen's Compensation Law. Judgment for defendant, and plaintiff appeals. Affirmed.

See, also, 219 S. W. 222.

Hunt & Teagle, of Houston, and Seay, Seay, Malone & Lipscomb, of Dallas, for appellant.

Wilkinson & McGaugh, of Brownwood, for appellee.

### Findings of Fact.

BRADY, J. Appellant sued to set aside an award of the Industrial Accident Board, made under the provisions of chapter 103, General Laws 35th Leg. (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—91), commonly known as the Workmen's Compensation Law. Appellant had insured the Tom Padgitt Company, of Waco, Tex., against loss by virtue of injury to its employés under such act;

---

and the award was in favor of Mrs. Lowry, as the beneficiary and widow of J. S. Lowry. The contest was based on the grounds that Lowry was not an employé, but an independent contractor, or, at least, not such an employé as comes within the purview of the act. Upon a trial without a jury, judgment was rendered for Mrs. Lowry, giving her compensation in the sum of $4,500, payable in weekly installments.

We desire to give appellant the benefit of a full statement of the facts in the case, and therefore copy the following statement from its brief, which is not challenged by appellee, and is believed to be substantially correct:

"It is agreed by the parties to this suit that, at the time of the death of J. Scott Lowry, the Tom Padgitt Company had more than three employés, and on said date carried a policy of insurance with the United States Fidelity & Guaranty Company of Baltimore, Md., of the kind required and permitted by the Employers' Liability Act of the state of Texas, and that said Tom Padgitt Company was a subscribing company, and had complied with all of the requisites of such act, and at the time of the death of said J. Scott Lowry said policy of insurance, issued by said United States Fidelity & Guaranty Company, in compliance with the provisions of said Compensation Act, was in full force and effect; that the United States Fidelity & Guaranty Company has a permit to do business in the state of Texas, and has complied· with all the requirements demanded of such companies, and is authorized and permitted to issue the kind of policy above described, which was issued to said Tom Padgitt Company.

"It is further agreed that due notice and claim of beneficiary was made in the time required by law by Mrs. J. S. Lowry, to the Industrial Accident Board of the state of Texas, at Austin, on account of the death of J. S. Lowry, and that all requirements of law in that regard were complied with.

"That at the time of the death of said J. Scott Lowry his average weekly earnings were, and had been for 1 year previous thereto, an aggregate of $1,089.93 per year, and an average weekly wage of $20.95.

"That said J. Scott Lowry was killed in Coke county, Tex., on February 11, 1918, by the overturning of his automobile.

"That on August 17, 1918, said Industrial Accident Board met and awarded on said claim, and within the time required by law; that said United States Fidelity & Guaranty Company gave Mrs. J. S. Lowry and the Industrial Accident Board of the state of Texas all required legal notices incident to appeal from said award, ·and did within the time required by law appeal from and file suit in the district court of Brown county, Texas; said notice to said Mrs. Lowry and said Industrial Accident Board contained all necessary legal prerequisites of such notice that it was not willing, and did not consent, to abide by the ruling of said board, which was served within the time required by law.

"That J. Scott Lowry left no minor children, no dependent parents nor grandparents, nor stepmother, and no dependent parents or de-pendent brothers and sisters, and that only his widow, the defendant, Mrs. J. S. Lowry, was dependent on him for a livelihood, and that he contributed support to no one except to the defendant, Mrs. J. S. Lowry.

"The award of the Industrial Accident Board was also introduced in evidence over the objection of appellant, as hereinafter appears.

"F. E. Goodman testified as follows:

"'My name is F. E. Goodman. My age is 49, and my residence is in Waco, Tex. I am a farmer, and also vice president of the Tom Padgitt Company of Waco, Tex., wholesale saddlery people. I have been connected with the Tom Padgitt Company for about 30 years.

"'I knew J. S. Lowry in his lifetime, and he was connected with the Tom Padgitt Company. Mr. Lowry was employed by the Tom Padgitt Company as a traveling salesman in West Texas on a commission basis, and had been so employed for several years prior to his death, his duties being such as are ordinarily incident to such work, and he traveled both on the train and in an automobile, principally in the latter.

"'Mr. Lowry resided and made his headquarters at Brownwood, and traveled as far north as the Panhandle, and as far south as Rock Springs, in Edwards county, and, as to how far west he would go, that was optional with him. In covering the territory in question he did not travel under the directions of the Tom Padgitt Company, as the company did not instruct him when and where to go, and Lowry used his own automobile, and paid all of his expenses incident to his traveling, and used his own discretion and judgment as to how and when he should travel, and also as to where he should travel in the territory in question.

"'Between the 1st and 5th of each month, the company settled with Mr. Lowry according to the gross sales made by him and accepted by said company, during the previous month, on a basis of 7½ per cent. average commission.

"'There was nothing in the contract with Mr. Lowry which precluded or prevented him from representing any other company or companies, or carrying any other line that he might decide to handle.

"'Mr. Lowry fixed his own time, and when and where he should travel in the territory in question.

"'There was nothing to prevent Mr. Lowry from carrying passengers in his automobile for a consideration and receiving such consideration. He did not work on a salary, but worked on a commission as fully stated above. I originally made the contract with Mr. Lowry on behalf of the Tom Padgitt Company, and the original contract was in writing, as I recollect it, but afterwards from year to year the contract was either renewed verbally or by correspondence, and for the last few years of his employment there was no formal written contract. The original contract and the subsequent renewals of same had been in existence during the period Mr. Lowry traveled for Tom Padgitt Company, that is, for several years before his death. He first traveled in a horse and buggy; he then bought an automobile. He sold this automobile and bought another, and was then given some railroad territory, in which he covered a few towns on the train, but the most of his territory was covered by automobile, and

the machine was his exclusive property. The Tom Padgitt Company did not own any interest in the machine, nor in any way connected with it. Mr. Lowry's agreement with the Padgitt Company was to work this territory as in his judgment he thought best; the matter was entirely in his hands to go and come, day or night, in any way that he saw beneficial; and for such orders as he secured from the trade in that territory that were O. K.'d and approved for shipment by the company and were shipped he received for his services a 7½ per cent. average commission for such orders as were shipped by them, the payment of this commission being paid Lowry by check on Waco between the 1st and 5th of each month following the date of sale, as the records of the Padgitt Company showed that they had shipped of the sales made by Lowry. Mr. Lowry was under his own management as to traveling in the territory. He was allowed to carry such other lines as he wanted to carry. He was allowed the privilege of discontinuing his services at any time, and the Padgitt Company was allowed the same privilege, to discharge him at any time his services were not satisfactory, or that they wanted to put any one else in that territory. The only obligation on the Padgitt Company's part was that their line of goods was not to be sold by any other salesman in that territory as long as Mr. Lowry represented them in the same territory. He was further allowed to carry anybody with him in his car, as it was his car. The upkeep and all expenses incident to his traveling in the territory were to be paid out of the commissions so far as the Padgitt Company was concerned, as they were not interested in any debt of any character nor had any liability on the part of Mr. Lowry so far as the Padgitt Company was concerned.

"Mr. Lowry covered some territory that he selected, and some of the territory covered by him was designated by the company; that is, as already stated, his territory extended on the north to the Panhandle, and on the south to Rock Springs, and Brownwood on the east, but his territory was unlimited on the west until he reached El Paso.

"Prices and terms were to be made by the Padgitt Company at all times; Lowry had nothing to do with making the prices except according to price lists and other directions furnished by the Padgitt Company, and the company forwarded him price lists whenever there were changes in the market.

"The Padgitt Company passed on the responsibility and solvency of the parties to whom Lowry made sales, and his sales were made and orders taken subject to approval by the company when the orders went into the house.'

"Mrs. J. S. Lowry testified:

"I am Mrs. J. S. Lowry, and the widow of J. Scott Lowry. J. Scott Lowry lost his life about the 11th of February, 1918. He was working at the time he was killed for Tom Padgitt Company of Waco.

"Mr. Lowry was traveling for Tom Padgitt when he was killed, selling Tom Padgitt's line of goods, harness and leather, and everything of the kind in their line. He had been engaged in that business for 18 or 19 years. I know the territory that he covered, because I used to go with him. He went to the Panhandle which was as far as he could go, and west as far as he could go, and to Rock Springs, and all the towns in between there. Tom Padgitt gave him the territory in which he traveled; he had that territory, and no one else had it. I was familiar with his contract with Tom Padgitt, because I traveled with him, and every once in a while Tom Padgitt would have him come into the house, and I used to go with him.

"I handled the correspondence; I would copy the letters he got from Tom Padgitt, and send them on to him, because sometimes he wouldn't get them; he would go through the towns, and other people would get his mail, so I would copy them and send him the copy. They were all the time changing the prices. Some other Lowry would come and get his mail, and he would get no mail. I would keep the letter at home, and send him the original.

"There were no other men traveling for the Tom Padgitt Company in his territory. There would be a racket if there was; he couldn't go in anybody's else territory. He got his prices from the Tom Padgitt Company. When we were getting ready for war the prices would come in every week. Whenever the goods went up he would go by what they said; he got instructions as to prices from Tom Padgitt Company.

"Sometimes he collected bills from customers for the company; sometimes he would also attend to other business for Tom Padgitt, seeing after some land that Tom Padgitt had down at London, which is out from Brady, in Schleicher county. He often attended to business like that, because he was acquainted with the territory and Padgitt wasn't. Tom Padgitt would want him to go and see if the land was all right; it was land that he had taken in on debts.

"I know of Mr. Lowry making collections for Tom Padgitt Company, but these collections would not always be for goods that he had sold; that would be when he would send him off to collect certain bills, when they would get behind.

"Tom Padgitt used to have Mr. Lowry come in to Waco, and when he did Tom Padgitt would pay his fare there and back; that was for the purpose of going over the stock and taking the price lists and looking the stock over; I used to go with him down there.

"Sometimes the crops were bad here, and he would go somewhere else to do business; the crops were bad here, and there wasn't any sale for anything, and they told him to go to Oklahoma, and gave him a territory up there, and that was where he was going when he got killed; he was going up there then, and he turned around and came back when I sent him that letter.

"That is the letter Tom Padgitt wrote him which you show me. He may have gone up to Oklahoma to sell some goods, but I don't just remember about it. He may have done that a little while; they were sending him up in that territory. I believe he did go up there once for a little while. I think they sent him up there one time. When he was killed he was coming from going up there. Tom Padgitt sent him there, and gave him a territory in Oklahoma. At the time he was on his way home.

"I have the letter Tom Padgitt wrote him to go to Oklahoma; that is the letter which

you show me. The letter reads: "Tom Padgitt Company. Wholesale Saddlery, Carriages and Buggies. Waco, Texas, January 3, 1918. Friend Lowry: As per your late request, we inclose check for $100. Hope it will reach you in due time. No news. Trade is quiet, although busy on government work. Some of your Oklahoma orders we have to decline on very poor standing. I wish you a better year for 1918. Your friend, Tom Padgitt." I haven't the letter Tom Padgett wrote him to go to Oklahoma; that is the last letter I sent on to him. Mr. Lowry had the other letters, and I haven't that.

" 'Mr. Lowry often wrote Tom Padgitt for instructions as to what to do; they gave him instructions and he did everything they told him to do. I haven't the letters; he destroyed those letters. He got letters nearly every day, and they were destroyed. Sometimes the letters would say for him to go to a certain place, and if he didn't have good trade there to go to some other place. He was supposed to go over the territory every 60 days. Some places he had better trade than others, and wherever he had the best trade he went; wherever he got the best trade for his interest and their interest he went there. If the party to whom he sold goods hadn't made his payments they wouldn't ship the goods, but he wouldn't know that until the 1st of the month; he wouldn't know how many of them had been approved at that time. It was not the situation that when they had inquiries from some retailer in the territory they would send that inquiry to Mr. Lowry, and that he would call on them; he would go there under Padgitt's instructions. They did give Mr. Lowry the benefit of the inquiries, though, if there were such. They never told him just when to go, because he was supposed to make the territory every 60 days. Part of their instructions to him was to send him the price lists so he would know what to charge the customers.' "

## Opinion.

The principal issue in this case is whether J. S. Lowry, under the facts stated, was an employé within the purview of the compensation law, or an independent contractor. In support of the contention that he was an independent contractor, appellant cites the following authorities: Western Indemnity Co. v. Prater, 213 S. W. 355; Moore & Savage v. Kopplin, 135 S. W. 1033; Stephenville, N. & S. T. Ry. Co. v. Couch, 56 Tex. Civ. App. 336, 121 S. W. 189; Edmundson v. Coca-Cola Co., 150 S. W. 273; In re Raynes, 66 Ind. App. 321, 118 N. E. 387; Bouvier's Law Dictionary, vol. 2, p. 1532; Words and Phrases, vol. 4, p. 3542; Honnold's Compensation Law, vol. 1, p. 208. None of these authorities appears to sustain appellant's theory. Indeed, the principles recognized in some of them would seem to be adverse. For instance, in Moore & Savage v. Kopplin, 135 S. W. 1033, it was said:

"We will remark, however, only such an employé as is free to do the work he is employed to do in his own way without directions, orders, let, or hindrance from his employer, being re-

sponsible to him only for the result, is regarded as such a contractor."

There is also nothing favorable to appellant in the quotation from Bouvier, which is as follows:

"An independent contractor is one who exercising an independent employment contracts to do a piece of work according to his own methods, and without being subject to the control of his employers, except as to the result of his work."

We also regard the rule announced in Honnold's Compensation Law, as applied to the facts of this case, to be against appellant's contention. This author states the rule as follows:

"The Compensation Law does not apply where the injured person is an independent contractor and the relation of the employer and employé does not exist. It is not possible to lay down a hard and fast rule or state definite facts by which the status of men working and contracting together can be definitely defined in all cases, as employés or independent contractors. Each case must depend on its own facts. Ordinarily no one feature of the relation is determinative, but all must be considered together. A contractor is ordinarily one who carries on an independent employment and is responsible for the results of his work, one whose contract relates to a given piece of work for a given price. These characteristics, however, though very suggestive, are not necessarily controlling. Generally speaking, an independent contractor is one who exercises an independent employment and contracts to do a piece of work according to his own methods without being subject to the control of his employers, save as to the results of his work."

None of the adjudicated cases cited by appellant is at all in point on the facts. The case claimed to be most nearly in point (In re Raynes, 66 Ind. App. 321, 118 N. E. 387). is an opinion by the Appellate Court of Indiana upon certified questions. In the language quoted by appellant, the court only undertook to give a concept in a general way of what classes of persons were within the protection of the Workmen's Compensation Act of that state. Furthermore, the court expressly stated that, under the facts certified, there appeared to be nothing inconsistent with the conclusion that the applicant was an employé within the meaning of the act.

We have been cited to no case which holds that a traveling salesman has been held to be an independent contractor, and we have found none. On the contrary, in 15 Cyc. at page 1033, a traveling salesman, whether employed on a salary or selling on commission, is defined to be an employé. See, also, Foley v. Home Rubber Co., 89 N. J. Law, 474, 99 Atl. 624; Industrial Commission v. Ætna Life Ins. Co., 64 Colo. 480, 174 Pac. 589, 3 A. L. R. 1336.

As sustaining the view that Mr. Lowry was an employé, and not an independent contractor, appellee's counsel cite the following authorities: 16 Am. & Eng. Enc. of Law (2d Ed.) p. 187; Waters v. Pioneer Fuel Co., 52 Minn. 474, 55 N. W. 52, 38 Am. St. Rep. 564; City of Tiffin v. McCormack, 34 Ohio St. 638, 32 Am. Rep. 408; Jensen v. Barbour, 15 Mont. 582, 39 Pac. 906; Cockran v. Rice, 26 S. D. 393, 128 N. W. 583, Ann. Cas. 1913B, 570; Muncie Foundry & Machine Co. v. Thompson (Ind. App.) 123 N. E. 196, 197; Wallace v. Southern Cotton Oil Co., 91 Tex. 18–22, 40 S. W. 399; Jernigan v. Houston Ice & Brewing Co., 33 Tex. Civ. App. 501, 77 S. W. 260, 261; Corrigan, Lee & Halpin v. Heubler, 167 S. W. 159–162; 16 Am. & Eng. Enc. of Law (2d Ed.) pp. 191, 192, subd. 9; 14 R. C. L. pp. 78, 79, subd. 16; Bodwell v. Webster, 98 Neb. 664, 154 N. W. 229, Ann. Cas. 1918C, 624, and note 632–634; Tuttle v. Embury-Martin Lumber Co., 192 Mich. 385, 158 N. W. 875, Ann. Cas. 1918C, 664; Sempier v. Goemann, 165 Wis. 103, 161 N. W. 354, Ann. Cas. 1918C, 670.

The act itself defines an employé as follows:

"Every person in the service of another under any contract of hire, expressed or implied, oral or written, except masters of or seamen on vessels engaged in interstate or foreign commerce, and except one whose employment is not in the usual course of trade, business, profession or occupation of his employer." Part 4, § 1, c. 103, Acts 1917, p. 291.

We are very strongly of the view that, independently of the standards or criterions usually employed to determine this question, the language of the act fairly comprehends the service and employment such as the undisputed facts show Mr. Lowry was engaged in when killed. It would seem that he was in the service of another, under a contract of hire, and that his employment was in the usual course of the business or occupation of his employer.

In 26 Cyc. pages 1546 to 1547, it is said that an independent contractor is one who, carrying on an independent business, contracts to do a piece of work according to his own methods, and without being subject to the control of his employer as to the means by which the result is to be accomplished, but only as to the result of the work. To the same effect is Jaggard on Torts, sec. 73, p. 228; and in Sherman & Redfield on Negligence (6th Ed.) p. 396, it is said:

"In actual affairs an independent contractor generally pursues the business of contracting, enters into a contract with his employer to do a specified piece of work for a specified price. * * * The one indispensable element to his character is that he must have contracted to do a specified work, and have the right to control the mode and manner of doing it."

The general rule is thus stated in 16 Am. & Eng. Ency. of Law (2d. Ed.) p. 187:

"Generally speaking, an independent contractor is one who, in rendering services, exercises an independent employment or occupation, and represents his employer only as to the results of his work, and not as to the means whereby it is to be accomplished. The word 'results,' however, is used in this connection in the sense of a production or product of some sort, and not of a service."

In Cockran v. Rice, supra, the Supreme Court of South Dakota emphasized the importance of the feature that the contract must be one to perform a certain definite and specified result, and contemplates a definite beginning, continuance, and ending. It was also stated by that court:

"A test of the relationship between the employer and employé is the right of the employer under the contract to control the manner and continuance of the particular service and the final result. No single fact is more conclusive as to the effect of the contract of employment, perhaps, than the unrestricted right of the employer to end the particular service whenever he chooses, without regard to the final result of the work itself."

And in nearly all of the cases cited by appellee stress is laid upon the test of service for another person as distinguished from the performance of a specific and independent work.

[1] In view of the facts that, properly speaking, Mr. Lowry was performing the usual and customary service for his employer as a traveling salesman, and that he was not doing any specified piece of work, nor undertaking the production of any given result, nor for any specified time, and that he might rightfully discontinue work, or be discharged at any time, and that there is evidence that he was actually controlled by his employer in the performance of his work, at least as to the main features of his employment, such as the soliciting of orders, the prices at which he should sell, and the terms of sale, the allotment of specified territory, and the approval and consummation of his sales by his employers, these considerations are decidedly characteristic of the services of an employé, rather than the contract or undertaking of an independent contractor.

We attach no importance to the point emphasized that Mr. Lowry was not upon the pay roll of the Tom Padgitt Company, and that it was shown that he was not paid wages. In lieu of wages, he received his compensation by way of commissions, and that he was not on the pay roll is thus readily accounted for. Neither do we regard as of controlling importance the fact that Mr. Lowry was performing his duties many miles from the place of business of his employer, and beyond the physical control of

such employer. He was where the duties of his employment reasonably required him to be, or at least where he might reasonably have been upon the business of his employer.

In the Foley Case, supra, a traveling salesman lost his wife in the sinking of the Lusitania, while en route to visit his employer's London office. His mission being connected with his employment, it was held that his presence on the ship was not such a consideration as would defeat recovery. It was held that the risk was inherent in the employment itself.

Further discussion of the question is not deemed necessary. We have concluded that upon authority and reason Mr. Lowry must be held to have been an employé within the meaning and purview of our Workmen's Compensation Act.

[2] This disposes of the principal question on the appeal, but it is contended that we should reverse and remand the case because of the alleged error in the admission of the certified copy of the award made by the Industrial Accident Board. This evidence was objected to, and the bill of exception shows that—

"Said award was introduced in evidence and considered by the court in rendering judgment herein."

We agree with appellee's counsel that, even if it was unnecessary to introduce the award of the board for any purpose, it is difficult to see how it could have been prejudicial to appellant, in view of the fact that appellant had attached a certified copy of such award to its petition. It is insisted, however, that since the bill of exception shows that the court considered such award in rendering judgment, it must have influenced him in deciding the merits of the case. We do not think this necessarily follows. It does not affirmatively appear that the award was offered in evidence or considered by the court on the issue of employé or independent contractor, which was the only real question in the case. In view of the novel procedure afforded by the statute, in an appeal to the courts to set aside an award, and the substitution of the judgment of a court to settle the controversy, it may well be that out of an abundance of caution counsel offered and the court admitted in evidence the certified copy of the award for jurisdictional purposes. It does not follow that because the trial judge considered the award in rendering judgment that he considered it for any improper purpose. Young v. Robinson, 135 S. W. 715, and authorities there cited.

In any event, we do not think the introduction of the award in evidence constituted reversible error, for the reason that upon all the facts, which were practically undisput-ed, the court could properly have rendered no other judgment. Under the evidence, we think the court might properly have instructed a verdict for Mrs. Lowry had there been a jury trial, and therefore the admission of the award in evidence was immaterial, and, if error at all, was harmless.

We do not question the soundness of the decision, upon this point, in Texas Employers' Ins. Ass'n v. Downing, 218 S. W. 112. It not only appears that there was a sharply controverted issue as to whether the plaintiff was totally and permanently disabled, upon which issue the jury might have considered the award, but the Insurance Association, in effect, requested that the testimony should be limited to proof of the fact that a final ruling and decision by the board had been made. It appears that, notwithstanding this request, the court overruled the objection, and practically permitted the award to go to the jury for all purposes. It was under such circumstances that the court held this ruling to be reversible error. The difference, we think, is manifest.

Being of the opinion that no reversible error has been shown, the judgment is affirmed.

Affirmed.