## AMERICAN NAT. INS. CO. v. DENKE.

### No. 1427.

Court of Civil Appeals of Texas. Waco.

Nov. 16, 1933.

Rehearing Denied Dec. 21, 1933.

Williams, Lee, Sears & Kennerly, Sam R. Fisher, and W. H. Blades, all of Houston, for appellant.

King, Wood & Morrow and H. E. Cox, all of Houston, for appellee.

ALEXANDER, Justice.

This action was brought by E. J. Denke for himself and as next friend for his minor son, Gerald Denke, against the American National Insurance Company to recover damages alleged to have been sustained by them as the result of certain personal injuries received by the said Gerald Denke. It was alleged that the defendant's agent, W. W. Saunders, negligently drove his automobile against the said Gerald Denke and so injured him as to require the amputation of his leg. A trial before a jury resulted in a verdict and judgment in favor of Gerald Denke for $20,000, and in favor of E. J. Denke in the sum of $5,-098. The defendant appealed.

No contention is made by the appellant that the accident, as the result of which Gerald Denke lost his leg, was not caused by the negligence of W. W. Saunders, the driver of the automobile in question. It does contend, however, that the undisputed evidence established that Saunders was an independent contractor and not a servant of appellant, and that by reason thereof the court should have given an instructed verdict in its behalf.

The evidence establishes that at the time of the accident the appellant was engaged in writing industrial insurance, with premiums payable weekly, and also regular old line insurance. · It had in its employment about twenty-five or thirty agents who were engaged principally in soliciting new insurance and collecting premiums on old policies. Saunders was one of such agents. For its purpose, the appellant had divided the city of Galveston into various blocks or territory called "debits," and each of such agents was assigned to a "debit." Such agent was required to spend the first three days of each week in collecting the weekly premiums due on policies in his "debit" and in locating prospects for new insurance. The remainder of the week was devoted to writing new policies. Saunders was under a written contract with the appellant by which he agreed, in part, as follows:

"1. In consideration of my appointment as an agent of the American National Insurance Company, I hereby agree as follows:

"2. To solicit new insurance and to collect premiums regularly every week. To obey the orders and to carry out the instructions of the company, and to use my best efforts to further its success.

"3. To keep true accounts of the business in such books as may be furnished by the company, and to remit to the Home Office, every week, at the time required, and on the form furnished by the company, a true account of all money received by me, with the cash received by me during each week, less authorized deductions.

"4. To pay all charges incident to sending moneys and parcels, postage, license or bond fees, and all other charges necessary to carry on the business of my agency, and I agree that out of any salary that may become due me the company shall first reimburse itself for any cost it may incur in furnishing me with a certificate of authority, license or other expense necessary to qualify me as agent, as imposed by the requirements of the State, County, City or Town in which I am to work.

"5. To forward no applications except upon lives personally seen by me at the time the application is made, and believed by me to be in sound health.

"6. To send to the Home Office each week with my account on the proper form a list of all policies upon which four weeks' premiums are due at the time of making up my account. * * *

"9. To comply in all respects with the instructions and rules from time to time issued by the Company. * * *"

Said contract further provided that "the agent will be paid a salary as follows: 'Fifteen per cent of the amount collected each week on debit.'" In addition, the agent was allowed certain commissions on all new policies written by him 'and' certain other commissions on the net increase of business in his debit. The commissions due him were not retained by him out of collections made, but all such collections were turned into the company, and the agent was paid the amount due him on each Saturday. The contract required him to account to the company on Monday of each week for all sums collected, but the company reserved the right to demand an accounting on any other day and as often as desired. The company could discharge him at will without notice. There was evidence to the effect that such agents were required to distribute literature in their territory advertising the business of the company. They were required to report to the office of the company at 7:30 each morning for the purpose of receiving a list of the premiums to be collected and instructions with reference to their work. They were divided into groups of six or seven each, and each group was under the supervision of an assistant superintendent. At these meetings, called "staff meetings," the superintendent first gave general instructions, and then each assistant superintendent gave more definite instructions to his group with reference to how to collect the premiums.

and write new insurance. If an agent reported. that he had failed to make certain collections, the assistant superintendent would give directions as to how to make the collection. Each agent was given a list of the premiums to be collected, together with the route to be followed or the order in which the debtors were to be called upon. Thursday, Friday, and Saturday of each week was devoted to writing new insurance. On these days, after attending the "staff meeting" in the morning, the agent went to work at 8 a. m., and worked until 11 a. m., and began work again at 1 or 1:30 in the afternoon and worked until 4 or 5 o'clock. He was required to attend another "staff meeting" at the office at 5:30 p. m., at which time he reported what success he had had during the day and his reasons for not writing more insurance. One of the agents testified that at such meeting "the assistant superintendent usually asked us how much we had written today and why we didn't write some more and how did we happen to fall down and how many calls we were going to make that night. He did not always ask why we had fallen down in those words, but more or less to that effect. Once or twice he had a nice word for you. If you really wrote some business they would kind of smile. If you went out and didn't write it they would smile but there was a sort of a hard line around that smile." After receiving such instructions at the evening "staff meetings" and after eating their dinners, the agents were required to return to the field of their work and solicit insurance for a few hours each night. Sometimes the assistant superintendent would require them to work in groups of twos or threes or in such other manner as he saw fit. Sometimes a more experienced agent was required to work with a less experienced one for the purpose of giving instructions to the new agent.

The accident in question occurred on Friday afternoon. On the morning of that day Saunders attended the usual "staff meeting" at 7:30, and in compliance with instructions from his assistant superintendent he spent the remainder of the morning until 11 a. m. soliciting insurance with a new agent named Johnson in Johnson's "debit." About 11 o'clock he separated from Johnson and went to solicit prospects in his own territory. That afternoon, after soliciting prospects in his own territory until about 4 p. m., he started in an automobile to another part of the city to a territory usually worked by another agent named Kries. It appears that Kries was a new agent, and that Saunders had been required to work with him in Kries' territory a few days prior thereto, and while so working Saunders had secured the names of some prospects. While on his way from his home to visit these prospects in Kries' territory for the purpose of selling them some insurance, he ran the automobile in which he was riding over Gerald Denke, inflicting the injury above indicated. The appellant did not furnish Saunders an automobile to use in the business, nor require him to use an automobile, but the evidence shows that Saunders did frequently use his wife's automobile for that purpose, with the knowledge and acquiescence of the appellant. He was so using his wife's automobile at the time of the accident.

Numerous elements are to be taken into consideration in determining whether one employed to perform a service is a servant or an independent contractor, but the most important element to be considered is whether or not the employer actually exercises, or has the right to exercise, control over the employee and to direct him in the material details as to how the work is to be performed. If the employer has control of the material details as to how the work is to be done, then the laborer is a servant of the employer and not an independent contractor. 23 Tex. Jur. 542; King v. Galloway (Tex. Com. App.) 284 S. W. 942; Maryland Casualty Co. v. Kent (Tex. Com. App.) 3 S.W.(2d) 414; Texas Employers' Ins. Ass'n v. Owen (Tex. Com. App.) 298 S. W. 542; Maryland Casualty Co. v. Donnelly (Tex. Civ. App.) 50 S.W.(2d) 388; Gulf Refining Co. v. Rogers (Tex. Civ. App.) 57 S.W.(2d) 183; McElrath v. Dixon (Tex. Civ. App.) 49 S.W.(2d) 995; United States F. & G. Co. v. Lowry (Tex. Civ. App.) 231 S. W. 818.

Applying the above rule to the facts of this case, we think it apparent that Saunders was a servant of the appellant and not an independent contractor. The written contract contemplated that Saunders would devote his full time to the company's business and bound him to obey the orders and to carry out the instructions of the company as issued from time to time and to use his best efforts to further the company's success. In addition, the appellant assumed and actually exercised the right to direct the employee in many of the details as to the manner in which the work was to be performed. The appellant not only required him to attend "staff meetings," but directed the route to be followed in making his collections, and fixed the hours of his labor. The company reserved the right to direct, and did actually direct, him as to whether he would solicit business in his own "debit" or whether he should spend his time in training a new agent in another "debit." The company held an effective control over the agent by reserving the right to discharge him at will. The facts in this case are substantially the same as those involved in the case of Fidelity Union Life Ins. Co. v. McGinnis (Tex. Civ. App.) 62 S.W.(2d) 186, in which it was held that the employee was not an independent contractor. There was ample evidence to support the verdict of the jury, and the court did not err in refusing to give an instructed verdict in appellant's behalf.

■ The appellant further contends that the verdict is excessive both as to the amount allowed Gerald Denke and the amount allowed the father, E. J. Denke. The evidence shows that Gerald Denke was 13 years old at the time of his injury and was in the seventh grade at school. He was in good health and had a life expectancy of 46 years. As a result of the accident the bones in his knee and the lower part of his leg were crushed and caused to protrude through the flesh. He was in the hospital for about one month, and suffered great mental and physical pain. His leg was amputated above the knee, and at the time of the trial, which was about 6 months after the accident, he was still on crutches and unable to use an artificial limb. Under the circumstances, we do not think that a judgment of $20,000 in his behalf is excessive. Galveston, H. & S. A. Ry. Co. v. Hopkins (Tex. Civ. App.) 202 S. W. 222; Wichita Falls R. & Ft. W. R. Co. v. Combs (Tex. Civ. App.) 250 S. W. 714; St. Louis S. F. & T. Ry. Co. v. Wilson (Tex. Civ. App.) 262 S. W. 1074; Galveston, H. & S. A. Ry. Co. v. Andrews (Tex. Civ. App.) 291 S. W. 590.

■ E. J. Denke, the father of Gerald Denke, was allowed a recovery of $5,098; $98 of this amount was for hospital bills incurred, and the balance was for "the diminished services of his minor son, Gerald Denke, from the time of his son's said injuries until he reaches the age of twenty-one years, less the reasonable cost of his said son's maintenance." The evidence shows that the boy's mother runs a rooming house and that his father is a stationary engineer. The father usually works for the railway company, but was not employed at the time of the trial. Prior to the boy's injuries he ran errands for his mother to the grocery store and meat market and kept the yard. Sometimes he made his own bed. There is nothing in the evidence to indicate that either of the parents is not able-bodied. The boy intended to prepare himself to do stenographic or other office work.

In estimating the loss sustained by a parent as the result of the maiming of a minor child, the parent is not confined to the loss of wages that would have been earned and contributed by such minor but for such injury. Such estimate may take into consideration the loss of the value of the services that would have been rendered in aid of the parents in everyday affairs as well as services which might have been rendered for pecuniary gain. It would seem that the parent has the right to recover for the value of the services lost, notwithstanding the fact that such parent had previously allowed, or intended to allow, the child to appropriate such earnings to his own use, for it is a matter for the parent to determine whether or not such earnings shall be donated to the minor. Neither is the parent required to deduct the cost of the maintenance of such minor from the value of the services lost, for, unlike a case where the minor dies, if the minor survives, the parent remains liable for his support until he attains his majority. It is therefore improper to deduct the cost of maintenance from the estimated value of the services during minority. Texas & P. Ry. Co. v. Brick, 83 Tex. 526, 18 S. W. 947, 29 Am. St. Rep. 675. In fact, it may reasonably be presumed that the cost of the care of such child has been increased by reason of the injury, and, if so, the parent should be allowed to recover for such excess cost. All these matters are to be taken into consideration in determining whether or not the verdict is excessive. While the writer is of the opinion that the verdict in this respect is excessive and should be reduced, the majority of the members of this court think otherwise. They are of the opinion that the verdict is not so manifestly excessive as to require this court to substitute its judgment for that of the jury and the trial judge. Consequently said assignment is overruled. Gulf, C. & S. F. Ry. Co. v. Dorsey, 66 Tex. 148, 18 S. W. 444; Baker v. Fields (Tex. Civ. App.) 236 S. W. 170, 171, par. 2, and authorities there cited; Western Union Telegraph Co. v. Hicks (Tex. Civ. App.) 253 S. W. 565, 569, par. 9; Chicago, R. I. & G. Ry. Co. v. Steele (Tex. Civ. App.) 264 S. W. 503, 512, par. 21.

The judgment of the trial court is therefore affirmed.