## WOODHALL v. IRWIN.

MASTER AND SERVANT—WORKMEN'S COMPENSATION LAW—INDEPENDENT CONTRACTOR.

Where decedent was engaged by defendant, a general contractor, to do a job of plaster patching for a customer, decedent undertaking to do everything connected therewith, to furnish the help and materials, to do and complete the job according to his own methods, he keeping an account of the materials used and the time of the men whom he employed and paid, the relation of master and servant did not exist so as to render defendant liable,

See notes in L. R. A. 1916A, 23; L. R. A. 1917D, 80.

under the workmen's compensation law, for the death of decedent, caused by a fall from a ladder while doing the work.

Certiorari to Industrial Accident Board. Submitted January 24, 1918. (Docket No. 66.) Decided June 3, 1918.

Minnie Woodhall presented her claim for compensation against John B. Irwin for the accidental death of her husband in defendant's employ. From an order awarding compensation, defendant and the Southern Surety Company, insurer, bring certiorari. Reversed, and award vacated.

*Sherman T. Handy*, for appellants.

*M. M. Larmonth*, for appellee.

OSTRANDER, C. J. Told in outline, the story in the record is a very ordinary and simple one. The owner of a store building wanted some repairs made to the front of it. What were needed to make the repairs were some mortar, a ladder, and a man with a trowel and bucket who knew how to do the work. It was a two or three or four-dollar job. The owner called up a general building and repairing contractor, Mr. Irwin, one of three contractors whom he had at times engaged to repair his buildings, and asked him to take care of the matter—to do the work. After some delay, Mr. Irwin sent Alfred Woodhall, a plasterer, to do the work. On June 7, 1916, Mr. Woodhall, using a ladder belonging to Mr. Irwin, undertook to make the repairs. He, assisted by Mr. Irwin, who did not remain, erected the ladder, carried some mortar up in a pail or bucket, fell from the ladder while at work, and sustained injuries which resulted in his death. No one saw him immediately before—at the instant be-

fore—he fell.   The consequence to Mr. Irwin is not simple.   It is a finding and award of the industrial accident board which requires him to pay to the widow of Mr. Woodhall $3,000—$10 a week for 300 weeks— an award which he and his surety, plaintiffs in certiorari, seek to have set aside.

From the testimony produced it is made to appear that Mr. Trempe, in charge of the particular building, frequently employed Mr. Irwin, the contractor, to estimate fire losses, to repair buildings.   It was the rule when a job of repairing was involved for him to tell Mr. Irwin about it—tell him to do the work.   In such cases Mr. Irwin charged him the cost of material and ten per cent. for supervision, employing whomsoever he pleased to do the work.   In such cases, Mr. Irwin called upon Mr. Woodhall, if the work was in his line as plasterer, to do the work.   Woodhall employed whomsoever he pleased to help him, if help was necessary, bought his material, charged 60 cents an hour for his own time and charged also the sum he paid for help if he employed help.   Woodhall rendered his bill to Irwin, who paid it.   A considerable number of such accounts appear in the record, made out in the form, "Mr. J. B. Irwin, To A. Woodhall, Dr., containing items for material and for work.   Sometimes, for a job of "patching" no time is specified, as for example:

"Mar. 20—Patching, plastering at McPike's ...... $0.75
           Mrs. Haerle's ......................... 3.75
Mar. 22—Hickler's ............................. 2.00"

There is one statement like this:

"April 11—Patching, Cor. Kimball
           and Dawson St. ................... $5.60
       19—Patching, Cor. Kimball
           and Dawson St. ..................... 5.60
       12—At 717 Peck St. ..................... 1.50
       19—At 610 South St. ................... 4.00

```
20—At 409 Portage Ave. W.—
    12 sks. wood fibre, at
    .45, $5.40;  8 hours,
    plasterer, at .60, $4.80;
    8 hrs. laborer, at .25, $2.00.......... $12.20
                                           ───────
                                           $25.70"
```

Another example may be given:

```
"Feb. 11, 1915.
    Plastering at 802 Brown St.—
        10 sacks wood fibre, at $.40...... $4.00
         5 hours plasterer ..............  3.00
         5 hours laborer ................  1.50
                                          ──────
                                                   $8.50
         5 hours laborer tending fires...          1.50
                                                 ────────
                                                 · $10.00"
```

Mr. Woodhall kept books of account. He kept an account of material and of the time of men whom he employed. He paid the men whom he employed to help him. For some time before he was killed, Mr. Woodhall, although occasionally taking a piece of work for a stated sum, usually, nearly always, charged for his time by the hour. He worked for others than Mr. Irwin. One general contractor testified that he had done all of his plastering for a period of about seven years, that he paid him by the hour, Woodhall keeping account of his time, Woodhall ordering material for the job, the bills for which were, however, rendered to the contractor. He was asked:

"*Q.* Mr. Woodhall, when he completed the work, would make out a bill for the expenses he had incurred in doing that work and his time at so much an hour, and you would pay it if it was correct, just the same as you would a plumber's bill or any one else who had come in to do some work for you? You simply told Mr. Woodhall what kind of work you wanted done and left it to him?

"*A.* Yes."

He also testified:

"Well, if we wanted a job of plastering done we would call him in and we would ask him to get his men and come and do a job of plastering and get what materials were required and when he got through the job he would simply bring us any statements of his time and we would get the bill of materials from the supply house, Mr. Kemp usually, and that is the way our work was always done.

"*Q.* And who paid, that is, who turned the money to the supply house?

"*A.* We did.

"*Q.* You did, you made the check direct to Kemp himself, if dealing with Kemp?

"*A.* Yes.

"*Q.* And how about the others, the laborers?

"*A.* We turned it over to Mr. Woodhall.

"*Q.* Who kept the time of Mr. Woodhall and those working with him?

"*A.* He kept it himself.  *  *  *

"*Q.* How did you regard him, as a contractor, jobber, employee, or what?

"*Mr. Handy:* I object to that.

"*A.* He was not a contractor.

"*Q.* Was he the foreman on that work?

"*A.* Yes, he had charge of it.

"*Q.* And what control did you have over that work?

"*A.* We had absolute control over it.

"*Q.* Could you direct a change?

"*A.* Certainly.

"*Q.* Could you direct more or less plastering.

"*A.* Yes.

"*Q.* Could you discharge him whenever you wanted to?

"*A.* Yes.

"*Q.* Or any man he had working?

"*A.* Yes.

"*Q.* You absolutely controlled them?

"*A.* Yes.

"*Q.* During all those years that he worked for you?

"*A.* Yes.

"*Q.* Do you carry industrial insurance?

"*A.* We carry our own insurance.

"*Q.* Was Woodhall and these men on your list of insured?

"*A.* Yes."

On cross-examination this witness testified:

"*Q.* In other words, when you have plastering to do you go to Mr. Woodhall or some other competent plasterer to do the work and give him instructions of what you want done, just the same as you would go to a plumber?

"*A.* Yes.

"*Q.* Now, if Mr. Woodhall was not on your pay roll how do you figure that you carried him in your insurance?

"*A.* Simply because we paid him so much an hour and we always charged compensation to the man whom we did the work for."

There is no occasion to set out more of the testimony. There is and can be no question about the facts, which in substance and as affecting the point under discussion do not differ from those appearing in the case of *Holbrook* v. *Hotel Co.*, 200 Mich. 597. In that case claimant's decedent operated very much as Mr. Woodhall did, but dealt directly with the owner of the property and not with a general contractor. In that case, as in this, decision of the board was rested, in part at least, upon *Tuttle* v. *Lumber Co.*, 192 Mich. 385, attention being called to the following language employed by the court:

"We are of the opinion that the test of the relationship is the right to control. It is not the fact of actual interference with the control, but the right to interfere, that makes the difference between an independent contractor and a servant or agent."

It seems to be too clear to require argument that the relation of Irwin and Woodhall was not the relation of master and servant. Nothing that Woodhall could have done would be imputed to Irwin. *Gall* v. *Journal Co.*, 191 Mich. 405. Impliedly, the contract was that Woodhall would do the job, selecting and furnishing proper material therefor, in a workmanlike manner. The reserved right of interference with the

actions of a servant which the master possesses is negatived by all of the testimony touching the agreement between them. What one or the other party to such a contract, the contract being established, says he could have done, his conclusion about his rights in the premises, does not affect the question. The consequences to Irwin, Woodhall having entered upon performance of his contract, if Irwin refused to let him complete it, might be negligible so far as injury and resulting damage to Woodhall were concerned. The principle remains. A general contractor, erecting a building, in a sense controls a subcontractor to whom he has, for example, sublet the job of plumbing. In a particular case he might be excused for compelling him to stop the work and to vacate the premises, not, however, in the exercise of the reserved right of interference with the servant's actions which the master possesses. It is evident that when Woodhall had agreed with Irwin to do a job of patching such as this was, he undertook to do everything connected therewith, to furnish help and materials; to do and complete a good job according to his own method. He could charge for it in terms of hours of labor and cost of material or in terms of a charge for the completed work. But Woodhall was his own master, accepting jobs of work to be done in his own way, or refusing them, as he pleased. He, and not Irwin, or any other man, determined the necessary time to be employed, the necessary help required, the quantity, etc., of material to be used, the way of doing the work, the terms in which his account should be rendered.

The award must be vacated, and with costs to plaintiffs in certiorari.

BIRD, MOORE, STEERE, BROOKE, FELLOWS, and STONE, JJ., concurred. KUHN, J., did not sit.