MACARIO v. BONIFAS-GORMAN LUMBER CO.

1. MASTER AND SERVANT—INDEPENDENT CONTRACTOR—RIGHT TO CONTROL.

The fundamental difference between an employee and an independent contractor is in the character of the contract of employment, and the test of the relationship is the right to control, not the fact of actual interference with the control.

2. SAME—RIGHT TO CONTRACT AS INDEPENDENT CONTRACTOR.

> One seeking to do work for another has a right to enter into a contract for the performance of such service as an independent contractor rather than an employee.

3. SAME—WRITTEN CONTRACT OF EMPLOYMENT—WORKMEN'S COMPENSATION.

> A written contract of employment, voluntarily entered into and in full force and effect at time one performing the service was injured, governs the relationship of the parties so far as the matter of workmen's compensation is concerned.

4. WORKMEN'S COMPENSATION — INDEPENDENT CONTRACTOR — LOG HAULER.

> Under written contract of employment whereby it was provided that plaintiff's decedent was to haul logs for defendant on his own truck and trailer at a stipulated rate per thousand feet, and while defendant was to load and unload them, he was to assist in such operations, he was to be the sole judge of the number of hours put in, the time he should start and quit and all other details of performance, that he might hire assistants at his own expense and if any were hired he was to furnish workmen's compensation insurance at his own expense, and that contract was irrevocable and should continue for 30 days, decedent was an independent contractor; hence plaintiff was not entitled to workmen's compensation for death of her decedent as result of injuries received while unloading logs.

Appeal from Department of Labor and Industry. Submitted October 4, 1939. (Docket No. 24, Calendar No. 40,664.) Decided December 19, 1939.

Jeanette Macario, widow of Charles Macario, presented her claim against Bonifas-Gorman Lumber Company for compensation for personal injuries sustained by her husband causing his death while in the alleged employ of defendant. Award to plaintiff. Defendant appeals. Reversed.

*Ray Derham,* for plaintiff.

*John B. Bennett* and *Ivan D. Wright,* for defendant.

POTTER, J. November 19, 1935, Charles Macario was injured while unloading logs in defendant's mill yard, and died November 21, 1935. November 13, 1937, plaintiff, widow of Charles Macario, deceased, made claim against defendant for compensation at $18 a week for total dependency, and for funeral expenses of $200. Defendant denied liability, claiming deceased was not its employee, that he suffered no accidental injury arising out of and in the course of his employment, that it had no notice of the deceased's accidental injury within three months after its occurrence, that no claim for compensation was made against it within six months, that plaintiff's claim was barred by the statute of limitations,* that plaintiff was not a dependent of deceased at the time of his accidental injury, that deceased's accidental injury was due to his own wilful and intentional misconduct, and that he was not in the employ of defendant at the time of the injury. The case came on to be heard before a deputy commissioner who, April 18, 1938, found and awarded as follows:

"1. Deceased suffered an accident while in the employ of said defendant Bonifas-Gorman Lumber Company on November 19, 1935, in the county of Houghton, State of Michigan;

"2. Deceased's average weekly wage at the time of the accident was $21 and;

"3. Deceased was employed as a common laborer;

"4. Plaintiff is entitled to receive compensation from said defendant in the sum of $14 a week for total disability from the 19th day of November, 1935, until the further order of the commission in accord-

---

* See 2 Comp. Laws 1929, § 8431 (Stat. Ann. § 17.165).—REPORTER.

ance with the provisions of Act No. 10, Pub. Acts 1912 (1st Ex. Sess.).

"6.   Medical fees as follows are to be paid by defendant to plaintiff, $42.75; and to Dr. W. A. Manthei, Lake Linden, $50.

"7.   Funeral expenses of $200 are to be paid by defendant to said plaintiff.

"9.   Remarks:   The deputy commissioner finds that at time of said accident, deceased was an employee of defendant, within the meaning of the workmen's compensation act."

May 2, 1938, application was made by defendant for review by the department of labor and industry of the order and award of the deputy commissioner, and April 4, 1939, the department of labor and industry affirmed the order and award of the deputy commissioner.

Defendant brings the case here by certiorari, called an appeal, alleging the department of labor and industry erred as a matter of law in holding the relationship of employer and employee existed between plaintiff's decedent and defendant at the time of decedent's injury; that plaintiff's decedent was an independent contractor; that the department erred in finding plaintiff's decedent was an employee of defendant; that the department, having found the written contract in force between plaintiff's decedent and defendant at the time of his injury, erred in holding plaintiff's decedent to be an employee; that it erred in holding a relationship other than that created by the contract existed between plaintiff's decedent and defendant; that the department erred in attempting to remake the contract entered into between plaintiff's decedent and defendant; that the award of the department of labor and industry was without support in the record, and contrary to law; and that defendant was

entitled to an award in its favor as a matter of law.

It is undisputed that plaintiff's decedent had a written contract with defendant, a copy of which is set forth in the margin as exhibit 1.*  Considerable

---

* EXHIBIT 1

### Log Hauling Contract

This agreement, made and entered into this 1st day of November, A. D. 1935, between the Bonifas-Gorman Lumber Company, a Michigan corporation, herein referred . to as the company and Charles Macario of the village of Lake Linden, county of Houghton, herein referred to as the contractor.

Witnesseth:  In consideration of the mutual covenants existing between the parties, and the further consideration specifically set forth in this agreement, the parties agree as follows:

1. The contractor agrees to haul various kinds of saw-logs from the company's Camp No. 1 & 2 which said logs are located on the following described property, to-wit:

| Camp No. 1 | | | Camp No. 4—Continued | | |
| --- | --- | --- | --- | --- | --- |
| Section | Township | Range | Section | Township | Range |
| 10 | 56 | 31 | 6 | 56 | 31 |
| 11 | 56 | 31 | 7 | 55 | 31 |
| 14 | 56 | 31 | 31 | 56 | 31 |
| 15 | 56 | 31 | 32 | 56 | 31 |
| 22 | 56 | 31 | | | |
| 23 | 56 | 31 | | | |
| 9 | 56 | 31 | | | |

| Camp No. 4 | | | Camp No. 5 | | |
| --- | --- | --- | --- | --- | --- |
| Section | Township | Range | Section | Township | Range |
| 1 | 55 | 32 | 9 | 54 | 32 |
| 2 | 55 | 32 | 10 | 54 | 32 |
| 11 | 55 | 32 | 16 | 54 | 32 |
| 12 | 55 | 32 | 20 | 54 | 32 |
| 13 | 55 | 32 | 21 | 54 | 32 |
| 14 | 55 | 32 | 28 | 54 | 32 |
| 36 | 55 | 32 | 30 | 54 | 32 |

It is understood that the contractor shall furnish, at his own cost and expense, a suitable logging truck and trailer for this purpose and that he will deliver the logs aforesaid to the company's mill in the village of Lake Linden.

2. For each thousand feet of logs so delivered to the Company's mill at Lake Linden, during the continuance of this contract, the company agrees to pay to the contractor the sum of

$2.25 dollars per thousand feet, Camp No. 1
$2    dollars per thousand feet, Camp No. 2
—— dollars per thousand feet, Camp No. 5

testimony was taken before the deputy commissioner. There is no real dispute between the parties except whether plaintiff's decedent was an employee of defendant or an independent contractor.

Plaintiff's decedent under the contract was to furnish his own logging truck and trailer and his own chains and stakes and other equipment at his own cost and expense. He was to deliver the logs of defendant from the particular lands mentioned and described in the contract to defendant's mill at Lake Linden and was to receive the price per thousand for such delivery there as stipulated in the contract. Defendant was to load the logs on decedent's truck in the woods and it was to unload them at its mill, but the contractor agreed to assist in the loading and unloading of the logs at no extra cost or expense to the company. The contractor was to be the sole judge of the number of hours he should work per day, the time he should start and quit and all other details of carrying out the contract. He was to be responsible to the company only for the results

3. It is understood that the company shall load the logs upon the contractor's truck in the woods and unload them at the company's mill at Lake Linden but the contractor agrees to assist in the loading and unloading of said logs at no extra cost or expense to the company.

4. It is understood that the contractor shall at all times be the sole judge of the number of hours he shall work per day; the time he shall start and quit and all other details as to the carrying out of said agreement and shall be responsible to the company only for the results accomplished hereunder.

5. It is also understood and agreed that the contractor may hire any number of assistants which he may deem necessary in connection with the operations under this contract at his own proper costs and expense and in the event such assistants are hired, the contractor agrees to furnish them coverage with workmen's compensation insurance at his own expense.

6. It is understood and agreed that the contract shall be irrevocable and shall continue in full force and effect for a period of 30 days from the date hereof.

BONIFAS-GORMAN LUMBER COMPANY,
By: CHRIS ERICKSON,
Superintendent.
CHARLES MACARIO,
Contractor.

accomplished. He could hire assistants to operate the truck or to assist him in operating it. It was up to him to say the number of logs that should be loaded upon his truck at any particular time. If he hired assistants, he was to pay them and furnish them coverage with workmen's compensation insurance at his own cost and expense. The contract was to continue in force for a period of 30 days.

Defendant wanted these logs delivered to its mill and plaintiff's decedent wanted a job. Defendant desired to get the logs delivered as cheaply as possible and plaintiff's decedent desired to deliver them as cheaply as possible so that he could make some money in the hauling of the logs. Plaintiff's decedent hired no one to help him and carried no workmen's compensation coverage on any assistant or assistants.

Both parties were familiar with the logging operations and with the trucking of logs. Plaintiff's decedent knew the logs were to be cut and skidded in the woods, loaded by defendant onto his truck by the company's loading crew by the use of a company jammer, and he was, by the contract, to assist in loading. About the only way he could assist was as a top loader. He was, by the contract, to assist in unloading and his assistance, if intelligent, would not interfere with, but would assist, the unloading crew at the mill. He unloosened the chains and the unloading crew did the rest. He knew when he entered into the contract that he was to haul logs over the logging road built and maintained by the defendant until he reached the public highway. He knew the loading crew went to work at 7 o'clock in the morning and that they could not load his truck if it was not in the woods. All the other haulers, and there were several other haulers engaged under like contracts, knew the same thing. Ordinary in-

telligence and the usual and ordinary conduct of the business indicated that if he wanted to profit by the job he would take his turn in being loaded and unloaded, take the logs from the skidways designated by defendant where the defendant maintained a loading crew to load his truck in accordance with the contract and by the usual loading method employed by defendant, the use of defendant's jammers. When the logs decked on a skidway were hauled, defendant's jammers were removed to other skidways and the loading crew went there to load logs onto the haulers' trucks. Plaintiff's decedent may have been told where to load but there is no proof he was told to load his truck himself. He was merely directed to the skidways where the jammers were in operation and the loading crew working. There is no proof he was told to load his own truck himself at any time, or that he did so, or that he handled "hot" logs, that is, logs not upon the skidways. So far as the record shows, he went to the skidways where the logs were and the loading crew stationed and the jammer erected. Defendant had two or three horse-operated jammers in operation at different skidways in the woods from which logs were to be hauled; and when several trucks were ready to load at the same time, defendant's woodsforeman may have directed these haulers where they should load in order to facilitate more speedy loading. This was in the interests of the hauler who was thus enabled to load more quickly and not compelled to wait. At the mill at Lake Linden, the logs were unloaded by an unloading crew in a storage pond, and if the storage pond at the mill was full they were unloaded on the ground in the mill yard. Other haulers with similar contracts testified they were told to be at the skidways in the woods at 7 o'clock in the morning. There is no proof that

plaintiff's decedent had such instructions. The loading crew was at the skidways in the woods at 7 o'clock in the morning and some haulers were there at 7 o'clock and other haulers did not arrive until later. The haulers could go home when they wanted, make as many trips as they desired so long as the loading crew was in the woods, and each hauler was paid every two weeks based upon the scale of the logs hauled by him. There was nothing in the contract requiring plaintiff's decedent to be in the woods at 7 o'clock in the morning. It was for his interests to be there as soon as he could be loaded by defendant's loaders.

The real gist of the department's decision is that "the contract appears merely to be a subterfuge to escape responsibility under the workmen's compensation law," and hence the contract is condemned and the liability of defendant established.

The legal question here is whether plaintiff's decedent was a workman or an independent contractor.

Both an ordinary workman or employee and an independent contractor are employed. The fundamental difference is in the character of the employment, in the contract by which one performs services for the benefit of the other.

*Chisholm* v. *Walker & Co.*, 2 B. W. C. C. 261 (46 Scot. L. Rep. 24), came before the court by an appeal from an award made by the lower court. The facts found were:

"Chisholm is the owner of a horse, and he along with others was engaged by Walker & Company to bring his horse and drag logs of timber for them from the side of a ship which they were discharging at Inverness harbour to various piles near the pier where those logs were stored according to their sizes. The hours during which the unloading of the ship was carried on were from 7 to 12 and 1 to 6.

Chisholm only dragged the logs from the ship's side while the unloading was proceeding. He received 8*s*. a day for himself and his horse. He might have got the 8*s*. a day by sending a servant, if he had one, to lead his horse. He was under no obligation to come on any particular day. He could be told not to come until he was wanted, but if he came and was wanted, he got a day's work for himself and his horse. He also habitually carted for coal merchants and for anybody else who would give him a job. He provided his own horse, and his duty was to lead that horse when it dragged the logs as he might be directed by Walker & Company's representatives. The pay was more for the work of the horse than that of the man. If he had been a servant working the respondents' horse his own wage would have been less than half the 8*s*. a day that he received. After the accident Walker & Company put a servant of their own to drive Chisholm's horse until the work was finished. Chisholm afterwards engaged a man to work his horse, collected the accounts for work done by him and paid him a wage of £1 per week. It was also proved that prior to the accident Chisholm was somewhat lame, and that in consequence he would not have been employed by Walker & Company as an ordinary workman to unload the ship, and that he was engaged merely as the owner of a horse. It was further proved that though Chisholm had been working for some days for Walker & Company before receiving his injuries he was under no obligation to do so. In his own words he 'could have left at any time for a better job.' He could also be dismissed at any time. There was no evidence that previous to the accident he had ever employed a servant to work his horse."

The court, by Clerk, L. J., said:

"On the facts stated here I cannot find anything to indicate that this man was a servant employed by a master and remunerated by wages, that is, at so much per day or per hour or per piece. The

present case is a case in which a man who has a horse of his own goes to a firm of timber merchants; they say that they want logs removed from one place to another; he says, 'I have a horse, I shall bring it and work any day you wish me to do so, and for that you will pay 8s. a day.' There is nothing there of the nature of wages. It would have been the same thing if he had brought 20 horses to do the work instead of one. The contract was that he should get the work done. It was not a contract that he should do the work personally, but that he should do it in the only way in which it could be done, by having somebody to lead the horse. That is not a contract of service.''

Low and Ardwall, L. JJ., concurred.

The case of *Chisholm* v. *Walker & Co.*, above cited, was referred to and quoted with approval in *Carleton* v. *Foundry & Machine Products Co.*, 199 Mich. 148 (19 A. L. R. 1141).

*Tuttle* v. *Embury-Martin Lumber Co.*, 192 Mich. 385 (Ann. Cas. 1918 C, 664), involved an oral contract to haul logs at a stipulated price per thousand, and the question there discussed was whether the plaintiff was an employee or an independent contractor. It was said (p. 399):

"We are of the opinion that the test of the relationship is the right to control. It is not the fact of actual interference with the control, but the right to interfere, that makes the difference between an independent contractor and a servant or agent."

It was there mentioned that the loading and unloading were under the control of the company, both as to time and place, and it was pointed out that the employee's work was limited by the right of the company to terminate it at any time; that it was for no definite period or amount. And it was held in that case that the plaintiff was an employee of the

company within the provisions of the workmen's compensation act.

In *Carleton* v. *Foundry & Machine Products Co.*, *supra,* the case of *Tuttle* v. *Embury-Martin Lumber Co.,* above mentioned, was extensively discussed and, after quoting the language above, that the test of the relationship was the right of control, it was said (p. 152):

"It is not a question of interference, or noninterference, not a question of whether there has been suggestions or even orders, as to the conduct of the work; but a question of the right to act, as distinguished from the act itself or the failure to act. There was evidence in that case showing such right to control. Tuttle could only perform his labor under the control of the company. * * * In that case a very pertinent fact in determining this question existed—he had not the right of substitution. The contract was for his personal services; and herein lies one of the distinguishing features in the instant case. Here the contract did not require the personal services of Carleton. He might work or not as he saw fit. The defendant had no say on that subject, no right of control over him or his time, or his movements. He could go or come as he saw fit. He contracted to produce results through means and men chosen by him, and did not contract for his personal services."

Then, after quoting *Chisholm* v. *Walker & Co.*, above cited, and *Vamplew* v. *Parkgate Iron & Steel Co.* (1903), 1 K. B. 851 (88 L. T. 756, 72 L. J. K. B. 575, 5 W. C. C. 114), it was said (p. 154):

"In the *Tuttle Case* the company had contracted. for the time and the services of a particular person, and the contract could not be performed, as matter of right, except by the performance of such services by the particular person employed. The master has the right to select his servants; he may hire and

discharge them.  He is the master who has the choice, control, and direction of the servants, and *control does not exist unless the hirer has the right to discharge them and employ others in their places.*"

In *McCormick* v. *Sears, Roebuck & Co.,* 254 Mich. 221, the parties entered into a written contract wherein it was agreed that for a period of one year from date plaintiff would accept any roofing job tendered him by defendant within 30 miles of the city hall in the city of Flint, would perform the jobs in a workmanlike manner, guarantee the roofs, employ the workmen on the jobs, have supervision and control, make good defects in workmanship, return to defendant all ladders and equipment loaned to him, save defendant harmless against demands for compensation, protect defendant against liens, claims and lawsuits.  Defendant was to furnish all material used on the jobs and pay plaintiff as compensation so much per square of the actual roofing. It was said:

"The department of labor and industry was not pleased with this contract  *  *  *  Nevertheless, the plaintiff had a right to make it and presumably he did so voluntarily.  If it was in force and effect at the time of the accident, and the work he was doing was being done under its terms and provisions, he must be held to have been an independent contractor.  It gave him the right to control the work and the workmen, to hire and to discharge them at will, and required him to pay them out of his compensation.  It provided that he should do the work according to specifications furnished by the defendant, and to make good any defects in workmanship.  In short, it was a contract to do a job of roof laying with full control of the work and means of accomplishing it.  In doing this work he was an independent contractor.  *  *  *

"If the contract rested in parol, the defendant's conduct would be strong evidence of the relationship of employer and employee; but it was in writing and the relationship of the parties must be measured by its terms and provisions. Moreover, actual interference or actual control is not the test of the relationship. In *Tuttle* v. *Embury-Martin Lumber Co.*, 192 Mich. 385 (Ann. Cas. 1918 C, 664), it was said:

" ' It is not the fact of actual interference with the control, but the right to interfere, that makes the difference between an independent contractor and a servant or agent.'

"By the provisions of the contract, the right to control was in the plaintiff, and the fact that there was actual interference by the defendant with his right did not change the relationship established by the contract.

"As the relation of employer and employee did not exist between the parties, the plaintiff was not entitled to compensation."

In that case, as in this, there was a written contract. Plaintiff's decedent must be held to have entered into that contract voluntarily. There is here no claim of fraud, false representation or coercion. The contract was in full force and effect at the time plaintiff's decedent was injured. Whatever work he was doing was being done under the terms and provisions of the contract. The relationship of the parties here must be measured by the terms and provisions of that contract. The fact that the defendant may have actually interfered with the rights of plaintiff's decedent under the contract did not change the relationship established thereby. We think that case controls the present one.

Award of the department of labor and industry is vacated.

BUTZEL, C. J., and WIEST, BUSHNELL, SHARPE, CHANDLER, NORTH, and McALLISTER, JJ., concurred.